UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| FRANCES JEANNETTE WATKINS, | ] | |
| on behalf of the ESTATE OF | ] | |
| RUSSELL COLEMAN BATTISTE, | ] | |
| | ] | |
| Plaintiff, | ] | |
| | ] | |
| vs. | ] | CV-04-CO-03523-W |
| | ] | |
| CITY OF MOBILE, *et al.*, | ] | |
| | ] | |
| Defendants. | ] | |

MEMORANDUM OF OPINION

I.    Introduction.

This action arises out of the death of Russell Coleman Battiste.

Plaintiff Frances Jeannette Watkins filed her original complaint (Doc. 1) in

this action on December 27, 2004, as administratrix for the estate of her

brother, Russell Coleman Battiste, and Plaintiff was granted leave to amend

her complaint on February 17, 2006.  (Doc. 210.)  Plaintiff's amended

complaint includes claims against Defendants under 42 U.S.C. § 1983

(hereinafter referred to as "§ 1983") for deliberate indifference and

negligent training and supervision; negligence; breach of contract; violations

of Ala. Code § 11-14-10 for failure to maintain a jail; violations of Ala. Code § 14-6-19 for failure to fund a jail; violations of Ala. Code § 14-6-105 for failure to appoint a watchman and fix his salary; and violations of the Alabama Medical Liability Act (hereinafter referred to as "AMLA"), Ala. Code §§ 6-5-480, *et seq.*, and 6-5-540, *et seq.* (Doc. 210.)

The Court has for consideration motions for summary judgment filed by defendants Billy Mitchem; David Wise; Ronald Cavanaugh; Naphcare, Inc. (hereinafter referred to as "Naphcare"); Dr. Collette Simon; Dr. Francis Henderson; Elizabeth Smith, LPN; Mary Jones, LPN; Diana Barnes, LPN; Jennifer Cook, LPN; Jack S. Tillman; Mobile County, Alabama; the city of Mobile, Alabama; Samuel M. Cochran; Mike Dow; Richard Cashdollar; and Michael Haley. (Docs. 404, 409, 411, 419, 422, & 426.) The issues raised in the defendants' motions have been fully briefed and are now ripe for decision. Upon full consideration of the legal arguments and evidence presented therein, the motions are due to be granted in part and denied in part.

II.     Facts.[1]

A.     Russell Coleman Battiste.

In 1999, Battiste was admitted to the University of South Alabama Medical Center with complaints of shortness of breath, significant loss of weight, fever, and persistent productive cough.  He was tested for HIV/AIDS on October 16, 1999, but checked out of the hospital against medical advice two days later, before being told the results of the test.  Battiste was admitted to the hospital again on October 20, 1999, at which time he was diagnosed as being infected with the "human immunodeficiency virus [HIV], stage C III, new diagnosis."  Battiste was also diagnosed as having "pneumocystis carinii pneumonia (PCP)" and a "non-tuberculosis mycobacterial infection."  While hospitalized, Battiste was treated for PCP, and he was placed on do not resuscitate (hereinafter referred to as "DNR") status.  Battiste was discharged from the hospital on October 27, 1999, and

_____

[1]The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, the parties' Joint Status Report, and the Court's own examination of the evidentiary record.  All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

instructed to follow up at the Mobile County Health Department (hereinafter referred to as "Health Department") for "HIV medications" to treat his condition.

The Mobile Police Department Incident Reports indicate that on June 16, 2001, Battiste called 911 and requested assistance because an unknown person was threatening him.  Two officers were dispatched, and as they approached the house, they observed an African-American male sitting outside drinking beer.  The man was later identified as Russell Coleman Battiste.  When the officers approached Battiste, he advised them that he had a gun, and he brandished the weapon at the officers.  They instructed Battiste to drop the gun and put his hands on his head.  He refused to follow their orders and began firing the gun, forcing the officers to take cover behind a parked vehicle and return fire.  Battiste was struck in the face. Following his arrest, Battiste was initially taken to the University of South Alabama Medical Center for treatment of a gunshot wound to the face. Immediately after his release from the hospital, Battiste was booked into the Mobile County Metro Jail and charged with two counts of attempting to murder the police officers.  On April 18, 2002, Battiste was found guilty of

attempt to commit assault first degree.  He was sentenced on May 9, 2002, to ten years in prison.

While in custody, Battiste was seen on August 15, 2001, by Keith Ramsey, M.D., at the Health Department.  During the visit, Dr. Ramsey noted: "Will need to restart HAART [highly active anti-retroviral therapy] - Combavir/Viracept."  He also stated that Battiste should be referred to "[ophthalmology] for decreased vision in his right eye."

Battiste was again seen by Dr. Ramsey at the Health Department on October 10, 2001, and was prescribed Valcyte, which is a drug used to treat an infection of the retina known as cytomegalovirus (hereinafter referred to as "CMV retinitis").  The medical record for the examination includes the following: "I spoke with Rhoda Manning @ Metro Jail and Mia Smith @ pharmacist CVS Pharmacy (sic) and was assured pt would received (sic) Valcyte tomorrow."  The Health Department's medical record also indicates that Battiste was on HAART and that he was "compliant" with his medications.

On October 12, 2001, Battiste was taken to an appointment with Dr. Mark Douglas at Premier Medical Group for evaluation of his CMV retinitis.

Dr. Douglas decided that Battiste needed to be taken to the hospital for intravenous administration of Gancyclovir.  Jail personnel then transported Battiste to the University of South Alabama Medical Center where he was admitted for treatment of CMV retinitis.  He was discharged on October 18, 2001.  Upon his return to the Jail, the medical staff decided to return Battiste to the hospital the same day.  Battiste received further treatment at the hospital through November 2, 2001.  Scott Minto, M.D., a physician at the University of South Alabama Medical Center recorded in Battiste's discharge note that he was "sent back to the [J]ail but the Jail refused to give him his IV medication there so he was sent back on 10/18."

Jail personnel took Battiste to a scheduled appointment at the Health Department on November 14, 2001.  The medical records for the visit indicate at the top of the page: "Pt. is taking meds regularly x 4 mos. Before he was not."  The records also note that Battiste was "compliant" with his HAART medications and that he was prescribed "Dapsone for PCP prophylaxis."  "Compliant" means that Battiste was "taking his medications as prescribed."

Battiste was transported by Jail personnel to an appointment at the Health Department on January 2, 2002, at which time he told Dr. Ramsey that he was taking his medications regularly.  Dr. Ramsey noted on the medical records that Battiste was "compliant" with his prescribed HAART medications.

Jail personnel returned Battiste to the Health Department on January 16, 2002.  The medical records for this appointment reflect that Battiste was on HAART and that he was "compliant" with his medications.  Dr. Ramsey also noted that Battiste's "peripheral neuropathy" that had been diagnosed during his previous visit had improved significantly with the taking of the prescribed medication.  Dr. Ramsey indicated that he wanted Battiste to continue with his then current medications, adding that Tums were to be taken with each dosage of Viracept.  The Mobile County Sheriff claims that the order for Tums was filled by the pharmacy, but Plaintiff disputes this contention.  At his deposition, Dr. Ramsey explained that diarrhea is a common complication of taking Viracept and that "it was our best assessment that the diarrhea he was continuing to experience was due to

Viracept, so we added Tums."   The presence of diarrhea was a clinical indication to Dr. Ramsey that Battiste was taking his Viracept prescription.

Battiste was taken by Jail personnel to a scheduled appointment at the Health Department on March 13, 2002.  The medical records noted that the diarrhea had improved and that Battiste was "compliant" with his prescribed HAART medications.  Dr. Ramsey testified that Battiste gave no indication, during the visit, that he was not receiving any of his medications.  However, Susan Pikula, a social worker at the Health Department, noted the following: "Cl [client] reported that he could use assistance [with] medications.  Cl reported he does not know he is receiving his medications."

Jail personnel transported Battiste to his April 3, 2002, appointment at the Health Department, at which time Dr. James Vande Waa drew a line and a question mark next to a box entitled "compliant."  He was also taken to see Dr. Douglas, the retinal surgeon, for a follow-up visit on April 10, 2002.

During a May 15, 2002, Health Department visit, Dr. Ramsey changed Battiste's medications.   The Sheriff contends that the Jail filled the

prescriptions provided by Dr. Ramsey.  As of May 16, 2002, the medical records indicate that Battiste was "compliant" with his medications.

Battiste was taken to a scheduled appointment at the Health Department on June 5, 2002, which was the last time he was seen by Dr. Ramsey.  Dr. Ramsey noted that Battiste was "tolerating" the medications that had been prescribed on May 15, 2002, which, according to Dr. Ramsey's deposition testimony, meant that he was not having any problems and had no complaints regarding his prescriptions.  Dr. Ramsey also testified that Battiste was not close to death at that time.  In fact, while being treated by Dr. Ramsey, Battiste's weight actually increased to 152 pounds.

On June 12, 2002, Corporal C. Patterson of the Mobile County Metro Jail performed a Classification Custody Evaluation Questionnaire on Battiste and documented that he "hears voices" and had attempted suicide in the past.

The only Medication Administration Record (hereinafter referred to as "MAR") documenting the dates, times, and medication administered to Battiste while he was at Mobile County Metro Jail is for the month of June

2002.  The other eleven months are missing from the Jail's records and defendant Sheriff Jack Tillman has been unable to produce them.

Battiste spent approximately one year in the Mobile County Metro Jail prior to his transfer to Kilby Correctional Facility (hereinafter referred to as "Kilby") on June 13, 2002, for processing into the Alabama Department of Corrections (hereinafter referred to as "ADOC").  On June 14, 2002, upon Battiste's initial medical history and screening performed at Kilby, his weight was 165 pounds.  Once Battiste arrived at Kilby, Cassie Luke, M.D., continued him on the anti-retroviral medications that the Mobile County Metro Jail documents show he was receiving immediately prior to his transfer: Viracept, Ziagen, and Sustiva, along with Dapsone for PCP prophylaxis.

On June 27, 2002, Battiste was transferred from Kilby to Limestone Correctional Facility (hereinafter referred to as "Limestone").  He was assigned to Dorm 16, the HIV/AIDS dorm.  The Medical Director at Limestone at the time was Collette Simon, M.D.  At his July 5, 2002, physical examination, Battiste was not experiencing any shortness of breath, and he told Dr. Simon that he had no complaints.  Battiste also did not show any

signs of respiratory distress, PCP, or wasting syndrome.  In fact, there is nothing in Dr. Simon's notes which indicates that Battiste was developing or had PCP at that time.  At the time of the physical, Battiste stated that he had no medical or physical complaints, and his documented weight was 150 pounds.

Two different genotypes were performed on Battiste to determine resistance to certain anti-retrovirals.  The first revealed resistance to four different medications, while the genotype performed on  August 7, 2002, showed resistance to ten distinct anti-retrovirals.  On August 30, 2002, Dr. Simon recorded in Battiste's medical chart that the results of the HIV/AIDS resistance test she ordered on August 7, 2002, demonstrated that his disease was resistant to all NRTI drugs with the exception of Tenofovir, all NNRTI drugs, and the drugs Nelfinavir and Saquinavir, which are protease inhibitors.  Based upon the results of these studies, Dr. Simon determined that it was appropriate to discontinue the regimen of Viracept, Sustiva, Videx, and Ziagen, and on August 30, 2002, she began a regimen of Kaletra, Crixivan, Viread, and Dapsone for PCP.  Dr. Simon also counseled Battiste on the need to comply with a new HAART regimen.  Shortly after he started the

new drug regimen, Battiste began to experience a persistent allergic reaction.  Benadryl was prescribed to address the allergy, and it began to clinically improve.

On September 11, 2002, upon physical examination by Dr. Simon, Battiste voiced no new complaints, no new rash was observed, and he reported that he felt "well."  On September 16, 2002, Dr. Simon noted that Battiste's condition was much improved, and, in fact, he was able to ambulate in the yard without any apparent distress.  Dr. Simon examined Battiste again on September 18 and 20, 2002, and he voiced no new complaints.  On September 23, Dr. Simon again counseled Battiste with regard to the advanced status of his disease, and she recommended that he comply with the HAART regimen or he would be vulnerable to an opportunistic infection.  Battiste was administered Norvir on September 24, 2002, and Dr. Simon continued to monitor Battiste's condition, looking specifically for any allergic reactions he might have to the medications. Naphcare contends that on September 27, 2002, Battiste refused to take the medication.  Nonetheless, he again had an allergic reaction.

Dr. Simon placed Battiste into the infirmary on October 17, 2002, and on October 22, she observed that Battiste was in severe respiratory distress and started him on oxygen supplementation by nasal cannula at a flow rate of five liters per minute.   Dr. Simon then ordered that Battiste be transferred to Huntsville Hospital.   By October 22, Battiste's weight had decreased to 121.9 pounds, according to the Huntsville Hospital Initial Admission Assessment form.   It was noted that Battiste was not currently on any HIV medications because of "multi drug resistance [to] HIV [and that Battiste was] off HAART therapy due to drug intolerance/resistance x 1 month."   On October 23, 2002, Battiste discussed the progression of his disease with the attending physicians at the hospital and decided that he did not want resuscitation and was placed on DNR status.   On October 24, Battiste was released from Huntsville Hospital and returned to the infirmary at Limestone.  On November 25, 2002, Dr. Simon noted that Battiste did not want to resume HIV medications because of his history of allergic reactions while on HAART medication.   Furthermore, Battiste told his sister-in-law, Gwendolyn Battiste, that he was not receiving the medication at Limestone that he had previously been taking in Mobile.

On December 29, 2002, at 7:30 a.m., Battiste was found with no pulse and not breathing.  Dr. Simon signed Battiste's Certificate of Death as the certifying physician, and the causes listed are: (1) respiratory failure; (2) PCP; (3) AIDS; and (4) wasting syndrome.

B.     Naphcare's Contract with ADOC.

Ronald Cavanaugh, as Director of Treatment for ADOC, drafted and issued a request for companies to submit contract proposals to provide health care services to the ADOC inmate population.  Naphcare contracted with the State of Alabama to provide medical care to inmates in the custody of ADOC beginning March 1, 2001, and the contract remained in effect through November 3, 2003.   The contract also included two one-year options, potentially extending it until 2006.  Michael Haley, as commissioner of ADOC, approved and signed the contract.  Defendants Jennifer Cook, LPN, and Mary Jones, LPN, were hired by the previous medical contractor but began working for Naphcare on or about March 1, 2001, when it took over health services for ADOC at Limestone.  LPN Cook only worked at Limestone

for three days at the beginning of Battiste's incarceration.[2]  Defendants

Diana Barnes, LPN, and Elizabeth Smith, LPN, were hired by Naphcare to

work at Limestone in 2002.

C.     Sheriff Jack S. Tillman.[3]

Jack Tillman is the former Sheriff of Mobile County, Alabama.  He

served as Sheriff during the time that Battiste was incarcerated in the

Mobile County Metro Jail.  During his incarceration, Battiste's sister,

---

[2]Defendant Jennifer Cook, LPN, has moved for summary judgment as to all claims asserted by Plaintiff against her in this case.  In her brief, she states that at no time did she see Battiste, provide medical care or treatment to Battiste, or ever administer any medications to Battiste.  (Doc. 438, p. 6.)  There is no evidence that LPN Cook ever interacted with Battiste.  *Id*. at 6-7.

Plaintiff never responded to LPN Cook's motion for summary judgment.  In fact, she did not list LPN Cook as one of the defendant nurses in her statement of claims in the Joint Status Report (Doc. 401, p. 29), and she did not list her as one of the employees who committed acts of negligence for which she asserts Naphcare is liable under the theory of respondeat superior (Doc. 459, p. 20.)  Federal Rule of Civil Procedure 56(e) states, "if the adverse party does not respond, summary judgment, if appropriate, shall be entered against the adverse party."  *See also Avocent Huntsville Corp. v. Clear Cube Technology, Inc.*, 443 F. Supp. 2d 1284, 1329 n. 172 (N.D. Ala. 2006) (citing *Chapman v. AI Transport*, 229 F.3d 1012, 1027 (11th Cir. 2000); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994)); *Bute v. Schuller Int.'s Inc.*, 998 F. Supp. 1473, 1477 (N.D. Ga. 1998).  The Court finds that there is no genuine issue of material fact regarding Plaintiff's claims against defendant Cook, and her motion for summary judgment is due to be granted in all respects.

[3]On February 18, 2005, this Court dismissed all "official capacity" claims against Sheriff Tillman.  The only remaining claims against Sheriff Tillman are in his individual capacity.

plaintiff Francis Jeannette Watkins, tried to visit him at least once per week.  During her weekly visits, Plaintiff remembers that Battiste sometimes looked sleepy "like had just woken up," and she remembers him complaining about his eyes.  Each time she visited, Plaintiff remembers that he was talkative and able to walk without difficulty.  As far as Plaintiff knows, Battiste did not need oxygen and he had no problem walking on his own while he was at the Mobile County Metro Jail.  Plaintiff has no recollection of Battiste ever telling her that he was not getting his medications at the Jail, and she has no evidence that he did not receive them.  During the course of Battiste's incarceration, the Mobile County Metro Jail purchased over $48,000.00 worth of prescription medications for him.  However, whether each of Battiste's prescriptions were filled by the Jail is in dispute.

The Jail's written policy was that inmates would have access to medical care to meet their serious medical needs and that they would receive timely care and medications that are ordered or prescribed.  If inmates were being seen by outside physicians, it was the Jail's policy to take them to their appointments with the outside physicians for chronic care

needs.  The Jail also had a policy of filling prescriptions immediately by an outside pharmacy and that medications would be given as ordered by the physician.

Neither Battiste nor any of his family members ever complained to Sheriff Tillman about any medical problems that he may have been experiencing.  Neither he nor any of his family members ever complained to the Sheriff about his receiving or failing to receive prescription medications. Plaintiff has also not provided the Court with any facts or evidence to show that Sheriff Tillman had personal knowledge of Battiste's medical condition.

D.     The Mobile County Metro Jail Facility.

Prior to construction of the Mobile County Metro Jail, the County Jail was operated in two separate locations by Sheriff Thomas Purvis.  There was an old jail facility located at the county courthouse, and there was a new facility which was built following litigation challenging overcrowding and the terms and conditions of confinement at the old jail.

Sam Jones, the current Mayor of the City of Mobile, served as a member of the Mobile County Commission from 1987 until his election as Mayor.  During the time he was a Mobile County Commissioner, Jones was

involved with the other commissioners in making determinations about the allocation of funds and other budgeting decisions.  The County entered into discussions with the City of Mobile about the possibility of the City closing its municipal jail facility and housing all of its detainees and prisoners in the County Jail.  In 1989, the Mobile County Commission entered into a contract entitled "Agreement Concerning Joint Jail Facility" with the City of Mobile and the Sheriff of Mobile County.  During that time, Commissioner Jones had several discussions with the then Mayor of Mobile, Arthur Outlaw, and the two came to an agreement, later incorporated into the Joint Jail Agreement, concerning the City's financial contribution towards the construction and operation of the expanded facility.

At no time, either before or after the Joint Jail Agreement, has the Mobile County Commission attempted to oversee the day-to-day operations of the Jail or to determine any policies and procedures for the operation of the Jail.  At all material times relevant to this action, the Mobile County Metro Jail has been operated by the Sheriff of Mobile County.  The Sheriff is a state constitutional officer who is elected by the citizens of Mobile

County.  The Sheriff sets policies for and operates the Mobile County Metro Jail.

With regard to its duty to provide funds to the Sheriff for the operation of the Jail, the Mobile County Commission annually established two separate budgets for the Sheriff's Department.  One budget is for the Sheriff and his general law enforcement functions.  A separate budget contains funding for the operation of the Jail.  Included in the line items for the Sheriff's operation of the Mobile County Metro Jail are monetary allocations for the Sheriff to use in providing medical care to inmates.  Each component that pertains to medical care is funded by the County Commission, and where additional care is needed over and above the amount budgeted, the Mobile County Commission has consistently paid for additional amounts over and above the line items in the original budget for that year.  John Pafenbach, County Administrator for Mobile County, is not aware of any incidents where the County has denied a request from the Sheriff for funding for necessary medicine or medical care at the Jail.  Although it provides funding for the Jail, Mobile County is not involved in any policies or procedures with regard to the provision of medical care to inmates or detainees in that facility.

III.    Standard.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id*. at 322-23.  In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or

by the 'depositions, answers to interrogatories, and admissions on file,'

designate 'specific facts showing that there is a genuine issue for trial.'"

*Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).  "A factual dispute

is genuine only if a 'reasonable jury could return a verdict for the

nonmoving party.'"  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d

1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real

Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

IV.    Discussion.

       A.    AMLA Claims Against Naphcare Defendants.

       Ms. Watkins asserts that the care and treatment provided by

defendants Naphcare, Henderson, Simon, Smith, Jones, and Barnes

(hereinafter collectively referred to as "Naphcare Defendants") did not

meet the standard of care expected of such healthcare providers and that

the sub-standard care proximately caused Battiste's death.   Plaintiff's

wrongful death claims against the Naphcare Defendants are governed by the

Alabama Medical Liability Act.  *See* Ala. Code  § 6-5-480, *et seq.*, and § 6-5-

540, *et seq.*  The Naphcare Defendants argue that Plaintiff's claims arising

under AMLA fail for two reasons: (1) because Plaintiff has disregarded the

heightened pleading requirement for causes of action arising under AMLA; and (2) because Plaintiff cannot show by substantial evidence that the defendants deviated from the standard of care and that such deviations probably caused Battiste's death.

      1.   AMLA's Heightened Pleading Requirement.

The Naphcare Defendants argue that Plaintiff has disregarded the heightened pleading requirement for causes of action arising under AMLA. Alabama Code § 6-5-551 qualifies the generalized pleadings allowed under the Alabama Rules of Civil Procedure by "requiring in medical malpractice actions that the complaint include a detailed specification and factual description of the act and omission the plaintiff says renders the health care provider liable to the plaintiff." *See Mikkelsen v. Salama*, 619 So. 2d 1382, 1384 (Ala. 1993).  Section 6-5-551 requires the plaintiff in cases arising under AMLA to:

> include in the complaint filed in the action a detailed specification and factual description of each act and omission alleged by plaintiff to render the health care provider liable to plaintiff and shall include when feasible and ascertainable the date, time, and place of the act or acts.  The plaintiff shall amend his complaint timely upon ascertainment of new or different acts or omissions upon

> which his claim is based; provided, however, that any such amendment must be made at least 90 days before trial. Any complaint which fails to include such detailed specification and factual description of each act and omission shall be subject to dismissal for failure to state a claim upon which relief may be granted . . . .

Ala. Code § 6-5-551.  Basically, § 6-5-551 requires the plaintiff in a medical malpractice action to provide the defendant health care provider with fair notice of the allegedly negligent act, and he or she "must identify the time and place it occurred and the resulting harm."  *Mikkelsen*, 619 So. 2d at 1384.

The Naphcare Defendants contend that the allegations in Plaintiff's Complaint and Amended Complaint fail to comply with the statute and, therefore, fail to state a claim against them as required by AMLA.  Plaintiff asserts that the Naphcare Defendants, as well as others, "deliberately, willfully, and negligently chose not to properly monitor and treat Mr. Battiste's condition."  (Doc. 210, ¶ 27.)  She further alleges that their actions and omissions include:

> (1) failing to timely respond to Mr. Battiste's request for medical examination, (2) failing to provide access to competent medical personal (sic), (3) failing to perform medical examinations, (4) failing to diagnose serious

medical needs, (5) failing to treat Mr. Battiste's serious medical needs, (6) failing to prescribe necessary medications, (7) failing to provide medication that was prescribed, (8) failing to administer the medication in accordance with its prescription, (9) failing to perform necessary blood tests critical to monitoring the health of an HIV positive inmate, (10) failing to perform and adequately interpret drug resistance test, (11) failing to vaccinate and immunize Mr. Battiste from serious life threatening infections and diseases, (12) failing to collect critical medical history, (13) failing to monitor Mr. Battiste's viral load count, (14) failing to monitor Mr. Battiste's CD4 count and other failures to be discovered, (15) failing to properly monitor, evaluate or (sic) those providing healthcare to Mr. Battiste, and for (16) failing to request Mr. Battiste's complete medical file from Mobile Metro Jail and other failures to be discovered.

*Id.* The Naphcare Defendants argue that Plaintiff's list is nothing more than a series of conclusory statements devoid of the detailed specification and factual description of each act and omission Plaintiff contends that each individual defendant committed which caused Battiste's death. (*See, e.g.,* Doc. 439, p. 3.)

In Plaintiff's response, she turns this Court's attention back to the early stages of this case when she filed a motion to compel certain written discovery requests from the Naphcare Defendants. (Doc. 123.) That motion involved the issue of whether AMLA or the Federal Rules of Civil Procedure

govern the pleadings and discovery in this case.  At a hearing held on September 29, 2005, the Court granted in part and denied in part Plaintiff's motion, at which time the Court specifically addressed the issue of whether Plaintiff's pleading would be governed by the federal rules or AMLA.  (Doc. 154.)  This Court determined that the federal rules will apply so long as federal claims remain a part of this case, and this Court's jurisdiction over the case remains to be premised solely upon federal question jurisdiction. The Naphcare Defendants argue in their reply that the Court did not address the issue of whether Plaintiff's Amended Complaint fails to state a cognizable claim for wrongful death due to its failure to comply with § 6-5-551.  While that specific issue was not raised, the purpose of § 6-5-551 is to provide a defendant with notice as to the claims that are raised against him. The Court finds that Plaintiff's Complaint was sufficient to put the Naphcare Defendants on notice as to which claims were asserted against them.

Moreover, it was clear to all the parties at the time of the hearing that Plaintiff's medical malpractice claims are governed by AMLA.  It was at that point that the Naphcare Defendants should have objected to the pleadings and requested that Plaintiff provide a more definitive statement related to

the claims against each individual healthcare provider if such claims were unclear as enumerated in the Amended Complaint. Moreover, the Naphcare Defendants have not shown that it was feasible at the time Plaintiff drafted and filed the First Amended Complaint to include the date, time, and place of each alleged act. Ala. Code § 6-5-551. Additionally, the Naphcare Defendants had the opportunity to, and, in fact, did seek such statements during the depositions taken during the course of discovery in this case. It is untimely for them to wait until discovery has been completed to move to dismiss Plaintiff's claims under Ala. Code § 6-5-551. Therefore, the Naphcare Defendants' late effort to have this Court dismiss Plaintiff's AMLA allegations for failure to state a claim is due to be denied.

2.    Wrongful Death Under AMLA.

To establish a claim of medical malpractice under AMLA, a plaintiff must prove, by substantial evidence, "that the health care provider failed to exercise such reasonable care, skill, and diligence as other similarly situated health care providers" in the same area of practice. *See* Ala. Code § 6-5-480, *et seq*., and § 6-5-540, *et seq*.; *see also* Ala. Code § 6-5-559; *Complete Family Care v. Sprinkle*, 638 So. 2d 774, 777 (Ala. 1994) (holding

that "[d]octors have the legal duty to exercise the degree of care, diligence, and skill that reasonably competent physicians in the national medical community would ordinarily exercise when acting in the same or similar circumstances.") (citing Ala. Code § 6-5-484; *Bradford v. McGee*, 534 So. 2d 1076 (Ala. 1988)).   To find liability in a medical malpractice case in Alabama, "there must be more than a mere possibility or one possibility among others that the negligence complained of caused the injury.  There must be evidence that the negligence *probably* caused the injury."  *McAfee v. Baptist Medical Center*, 641 So. 2d 265, 267 (Ala. 1994) (quoting *Baker v. Chastain*, 389 So. 2d 932, 934 (Ala. 1980)) (internal citations omitted); *see also Rivard v. University of Alabama Health Services Foundation*, 835 So. 2d 987, 988 (Ala. 2002) (quoting *Bradford v. McGee*, 534 So. 2d 1076, 1079 (Ala. 1988)).  Plaintiff must establish this by presenting "evidence which would convince an unprejudiced thinking mind of the truth of the fact to which the evidence is directed."  Ala. Code § 6-5-542(5).  Under this heightened burden of proof, Plaintiff must demonstrate: (1) the appropriate standard

of care;[4] (2) that the defendant health care providers deviated from the appropriate standard of care in treating Battiste; and (3) a proximate causal connection between the providers' care and Battiste's death.  *See Rivard*, 835 So. 2d at 988; *Hauseman v. University of Alabama Health Services Foundation*, 793 So. 2d 730, 734 (Ala. 2000) (quoting *Looney v. Davis*, 721 So. 2d 152, 157 (Ala. 1998)).

Under AMLA, it is well established that a plaintiff must provide substantial evidence in the form of expert testimony as to each of the three elements set forth above.  *See* Ala. Code § 6-5-548; *Dansby v. Hagood*, 719 So. 2d 839, 842 (Ala. 1998) (stating that a plaintiff in a medical malpractice case must utilize medical expert testimony to establish causation); *Williams v. Spring Hill Memorial Hosp.*, 646 So. 2d 1373, 1375 (Ala. 1994) (noting that

---

[4]

> The standard of care is that level of such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice, ordinarily have and exercise in like cases.  A breach of the standard of care is the failure by a health care provider to comply with the standard of care, which failure proximately causes personal injury or wrongful death.   This definition applies to all actions for injuries or damages or wrongful death whether in contract or tort and whether based on intentional or unintentional conduct.

Ala. Code § 6-5-542(2).

the plaintiff is first required to prove each element of her case through expert testimony).  Exceptions to this rule include where an understanding of the alleged lack of care requires only common knowledge or where the plaintiff employs a generally recognized standard or authoritative medical text or treatise to prove what is or is not proper practice.  *See, e.g.,* *McAfee*, 641 So. 2d at 267; *Sprinkle*, 638 So. 2d at 777; *McMickens v. Callahan*, 533 So. 2d 579 (Ala. 1988).  Because there is no indication that Plaintiff is relying on any of the exceptions to establish her claims under AMLA, she must provide expert testimony.  In order for a medical expert's testimony to be deemed admissible as to the applicable standard of care and breach or compliance with that standard, two tests must be satisfied.  First, the expert must be found competent to testify under the State substantive law, provided in this case by AMLA.  Second, the testimony must be found to be admissible under Rule 702 of the Federal Rules of Evidence.

> a. Competency to Testify Under AMLA: Similarly Situated Experts and the *Medlin* Framework.

In order to establish the standard of care and breach of that standard through expert testimony, Plaintiff must prove that her expert witnesses are

"similarly situated" to the defendants in this case.  The Alabama Supreme

Court has set forth a three-prong test to be applied by trial courts before

deciding whether a proffered expert witness is a "similarly situated health

care provider" under Alabama Code § 6-5-548.  *Medlin v. Crosby*, 583 So. 2d

1290 (Ala. 1991).  Under *Medlin*, a court must consider three questions:

> (1) What is the standard of care alleged to have been
> breached? (2) Is the defendant 'health care provider' a
> specialist in the discipline or school of practice of the
> standard of care that the court has previously determined
> to have been breached? (3) Does the proffered expert
> witness qualify as a "similarly situated health care
> provider" under the subsection determined in the second
> step to apply[?]

*Id*. at 1293; *accord Husby v. South Alabama Nursing Home, Inc.*, 712 So. 2d

750, 753 (Ala. 1998); *Dempsey v. Phelps*, 700 So. 2d 1340, 1344 (Ala. 1997).

(1)    Standard of Care.

*Medlin* requires the Court to first determine the standard of care that

was allegedly breached.  583 So. 2d at 1293.  In a case factually similar to

the one at hand, the Alabama Court of Civil Appeals held that the standard

of care for the purposes of meeting the first prong of the *Medlin* analysis

was "that of a doctor practicing internal medicine in diagnosing a patient

with infections of the brain." *King v. Correctional Medical Services, Inc.,* 919 So. 2d 1186, 1193 (Ala. Civ. App. 2005).  In *King,* the sister of a deceased inmate brought the action against the state department of corrections, the commissioner of the department of corrections, and the department's medical provider for negligence and violation of an inmate's constitutional rights arising out of the inmate's death resulting from a brain infection.  *Id.  See also, Ex parte Waddail*, 827 So. 2d 789, 793 (Ala. 2001) (articulating the standard of care as being "that of a doctor, practicing emergency medicine, would exercise in stabilizing a diabatic patient before transporting that patient to another facility.").  Therefore, the Court finds that the appropriate standard of care for the case *sub judice* is that of a doctor or LPN practicing internal medicine, focusing on infectious disease, in diagnosing and treating a patient suffering from HIV/AIDS and the opportunistic infections often associated with HIV/AIDS, such as PCP.

> (2)   Are the Defendant Health Care Providers Specialists?

The second prong of the *Medlin* analysis requires the Court to inquire into whether any of the defendant health care providers qualifies as a

specialist in the discipline, or school of practice, of the standard of care that the Court set out above.  583 So. 2d at 1293.  In order to qualify as a specialist under § 6-5-548(c), a health care provider must meet the following criteria: (1) board certification as a specialist in the area in question; (2) training and experience in that specialty; *and* (3) holding himself or herself out as a specialist.[5]  § 6-5-548(c) (emphasis added); *see also Ronderos v. Rowell*, 868 So. 2d 422, 426 (Ala. 2003) (holding that the doctor met "*all* of the criteria for a 'specialist' listed in § 6-5-548(c)") (emphasis added); *Waddail*,  827 So. 2d at 793 (noting that the post-1996 amendment version of the statute requires that all three requirements be met in order for a doctor to qualify as a specialist); *cf. Medlin*, 583 So. 2d at 1292-93 (quoting the former version of the statute which employed "or" instead of "and").

Dr. Simon is board certified in internal medicine and infectious disease.  However, this alone does not qualify her as a specialist.  Dr. Simon

---

[5] The Naphcare Defendants misquote the statute as including "or" where it actually employs "and."  (Doc. 439, p. 17.)  Prior to the 1996 amendment to § 6-5-548(c), the statute included "or," but the Alabama legislature later changed it to "and" to require that all three criteria be met.  *Waddail*, 827 So. 2d at 793.  This is not an insignificant oversight, as the use of "and" requires the defendant doctors to meet all three criteria, but in their briefs the Naphcare Defendants merely state that they are board certified and, therefore, qualify as specialists under the statute.  (Doc. 439, p. 18.)

assumes in her brief that she qualifies as a specialist under § 6-5-548, but she does not explicitly establish all three elements required by the statute. (Doc. 439, pp. 17-20.)  Dr. Simon has established that she is trained and experienced in internal medicine and infectious disease, as well as that she has experience dealing with patients suffering from HIV/AIDS.  However, the evidence shows that Dr. Simon practiced medicine at Limestone prison at the time of the alleged negligent acts - it does not show that she held herself out as a specialist in the area of internal medicine and infectious disease.  In *Medlin*, the Court explained that to hold themselves out as specialists the defendant doctors must have "taken affirmative steps to present [themselves] to the public as [specialists]."  583 So. 2d at 1295.  Dr. Simon has failed to provide any evidence that she held herself out as a specialist as required by § 6-5-548(c).  Therefore, the Court does not find that she is a specialist under the statute.

There is no claim before the Court that the defendant nurses are specialists under the statute.  Therefore, the Court will not treat them as specialists for the purposes of the *Medlin* analysis.

(3)     "Similarly Situated" Experts.

The final step in the *Medlin* framework is to determine whether Plaintiff's experts are "similarly situated health care providers."  583 So. 2d at 1293.  Without similarly situated experts under § 6-5-548 and the *Medlin* framework, Plaintiff cannot meet her burden of proving through substantial evidence either the standard of care or that the Naphcare Defendants breached that standard.   Because the Court finds that none of the defendants have demonstrated that they are specialists under AMLA, the Court must look to § 6-5-548(b) to determine whether Plaintiff's experts are "similarly situated."  *See Husby*, 712 So. 2d at 751-52 (finding that the nursing home administrator and anesthesiologist offered by the plaintiff as experts were not "qualified to testify about the standard of care allegedly breached" because neither of them "was a nurse qualified to give testimony regarding the standard of care of 'hands on' health care providers in a long-term care facility.").  Plaintiff has offered Drs. David Wohl and Roderic Gottula as medical experts in this case, as well as Nurse Joey Upland, RN, as an expert on nursing.  To qualify as "similarly situated" each of her experts must meet each of the following:

> (1) Is licensed by the appropriate regulatory board or agency of this or some other state.
> (2) Is trained and experienced in the same discipline or school of practice.
> (3) Has practiced in the same discipline or school of practice during the year preceding the date that the alleged breach of the standard of care occurred.

Ala. Code § 6-5-548(b).

### (a)    Dr. David Wohl.

Plaintiff has designated David Wohl, M.D., as an expert to offer his opinion regarding both the care provided to Battiste by Dr. Simon, as well as Battiste's cause of death.  Dr. Wohl, like Dr. Simon, is board certified in internal medicine and infectious disease.  Dr. Wohl is an Associate Professor of Medicine in the Division of Infectious Disease at the University of North Carolina at Chapel Hill.  He is also the Co-Director of the University's AIDS Clinical Trials Unit.  He serves as the supervising attending physician at the Infectious Disease Clinic at the University - an outpatient facility providing hands-on care to over 1,200 individuals living with HIV infections - where he follows over 200 of his own HIV patients.  Since 1996, Dr. Wohl has provided HIV care in the North Carolina Department of Corrections and has served as its Co-Director of HIV Services.  Dr. Wohl is licensed by an appropriate

regulatory board, he is trained in the same discipline as Dr. Simon, and he practiced in a virtually identical discipline during the year preceding the alleged breach.  Clearly, he is a similarly situated expert to Dr. Simon under § 6-5-548(b).[6]  He is not, however, similarly situated to the defendant nurses and, thus, is incompetent to testify to either their standard of care or any alleged deviations from the standard.

(b)    Dr. Roderic Gottula.

Plaintiff has also offered the testimony of Roderic Gottula, M.D., as an expert in this case.  Dr. Simon who is board certified by the American Board of Internal Medicine and Infectious Disease, contends, in her brief, that  in order to be "similarly situated," and therefore competent to testify under AMLA, Dr. Gottula must be board certified in the same specialty.   This contention is misplaced because Dr. Simon does not qualify as a specialist under § 6-5-548(c).  Dr. Gottula is certified by the American Board of Family Practice, an "appropriate regulatory board or agency."  (Naphcare Exhibit

---

[6]It is also clear to the Court that even if Dr. Simon held herself out as a specialist and met the requirements for a specialist under § 6-5-548, Dr. Wohl would still be a similarly situated expert to Dr. Simon.  He is board certified in the same specialties, he practices internal medicine with a focus on treating patients with HIV, and he provides HIV care to inmates in the North Carolina Department of Corrections.

K, Gottula Depo., p. 82.)  However, there is no evidence that Dr. Gottula is trained or experienced in "the same discipline or school of practice," that is internal medicine or infectious disease.  *Id*. at 188.  He has not initiated any treatment to patients with HIV or AIDS, and he testified at his deposition that he is not an infectious disease expert.  *Id*. at 209.  The case law applying § 6-5-548 is clear.   Under AMLA, Dr. Gottula is simply not competent to testify as to any alleged breach of the standard of care by Dr. Simon.  He is also not a similarly situated expert to the defendant nurses in this case.  *Id*. at 188.

### (c)    Nurse Joey Upland, RN.

Plaintiff has identified Joey Upland, RN, as an expert in this case regarding the alleged deviations from the standard of care committed by the nursing defendants.  She has been a practicing Registered Nurse in the State of California for the past twenty-nine years.  Of those twenty-nine years, Nurse Upland spent twenty-three of them in correctional nursing, seven of which were spent as a trainer in HIV/AIDS communicable disease instruction for the County Department of Corrections.  The defendants do not appear to argue that Nurse Upland is not similarly situated to the defendant nurses.

The Court finds that Nurse Upland is competent to testify regarding the applicable standard of care and the alleged breaches of that standard committed by the defendant nurses in this case.

> b.   Alleged Breaches of the Standard of Care and Causal Connection.

The Naphcare Defendants argue that Plaintiff has failed to show, through expert testimony, that any alleged breach of the standard of care caused Battiste's death.  Ms. Watkins must show that there is "more than a mere possibility or one possibility among others that the negligence complained of caused the injury." *McAfee*, 641 So. 2d at 267.  In addition to demonstrating the appropriate standard of care, as discussed in the previous section regarding similarly situated experts, Plaintiff must show: (1) that the defendant health care providers deviated from the appropriate standard of care in treating Battiste and (2) a proximate causal connection between the providers' care and Battiste's death.  *See Hauseman*, 793 So. 2d at 734.

(1)    Dr. Simon.

Dr. Wohl has expressed his opinion that "Dr. Simon's acts of medical negligence allowed Mr. batiste (sic) to develop PCP, allowed his PCP to go untreated, and caused him to needlessly die of PCP on December 29, 2002." (Pl.'s Ex. 60, Wohl Affid., p. 10.)  Regarding the issue of causation, Dr. Wohl testified as follows:

> Q:    With regard to Mr. Battiste, you've stated in your report that he had fatal pneumonia; is that your opinion?
> A:    Are you asking me: Do you think Mr. Battiste died of pneumonia?
> Q:    Yes, sir.
> A:    Yes.
> Q:    And what's the basis for your opinion?
> A:    So, this might be a good point for me to refer to my statement that I made in the report on the plaintiff - report of the plaintiffs' expert.
> Q:    Yes.
> A:    Not to avoid answering your question, which I will, but this might be a good point to clarify a statement that I made in here, now that we are talking about this particular report.[7]
>
> . . .

---

[7] Dr. Simon argues that Dr. Wohl never did answer the question regarding the basis for his opinion regarding causation.  (Doc. 439, p. 9.)

Page 39 of  141

Q:    Well, I think I got us off-track.  And I apologize.  I was going through the specific criticisms of Dr. Simon.  And I think we were - criticism you listed was failure to consistently provide prophylaxis against PCP pneumonia.  And that is a criticism you have; as I understand it?

A:    Yes, sir.

Q:    And that is the disruption of the prescription Dapsone?

A:    Specifically, there - Dapsone was discontinued in early September, along with the other medications and was not started back until 10/10, October 10th.  And was prescribed at a point where, as we talked about before, he already had some clinical manifestation[s] of pneumonia.  That is episode number one.  In addition, after that point, or at that time, the failure to recognize that he had PCP, and to treat him for alternative diagnosis, compounded that problem.  Secondary, after his - after his hospitalization at Huntsville, it happens again.  Dapsone is on hold.  He's given an alternative regiment (sic) for treatment of his PCP; when the regiment (sic) that was prescribed or recommended was found to be unavailable after a lapse of several days.  After then[,] after the acute treatment period is over, his failure to reinstitute prophylaxis against the infection we think he had, that lead to his hospitalization.  And during the time period from the time when his acute therapy for PCP ended, to his death, he was not put back on prophylaxis with Dapsone or any alternative medicine for PCP.

Q:    So it's your opinion that he had PCP pneumonia, and that's what caused his death?

A:    Yes sir.

Q:    Even though there was no specific diagnoses of that,
       correct?

(Naphcare Def.'s Exhibit I, Wohl Depo., pp. 100, 157-60.)  In her brief, Dr.

Simon makes it appear that Dr. Wohl formed his opinion that Battiste died

of PCP despite the fact that there was "no specific diagnoses of that."

(Doc. 469, p. 8.)  Dr. Wohl explained in his affidavit that there are two

different ways PCP diagnoses are made.  (Pl.'s Exhibit 60, Wohl Affid., p.4.)

The majority of all PCP diagnoses are made clinically, which is how each

doctor who saw Battiste from September 2002 through December 2002

diagnosed him.   When and if a clinical diagnosis is unsuccessful or

inconclusive, a physician may perform a bronchoscopy to try to

microscopically diagnose PCP.   The procedure is uncomfortable to the

patient, and, according to Dr. Wohl, it is uncommon to perform the

procedure unless medically necessary.  *Id*.  In Battiste's case, according to

Dr. Theresa Ann Coomer, Battiste's treating physician at Huntsville Hospital,

because there was a very strong clinical diagnosis of PCP, a bronchoscopy

was unnecessary.  (Pl.'s Exhibit 33, Coomer Affid., p. 1.)  When counsel for

Dr. Simon insinuated that a PCP diagnosis was never made, Dr. Wohl

testified:

> I disagree . . . the diagnosis was made.  The question is:
> Was it a clinical diagnosis?  Or did they subject this man to
> a fiber-optic bronchoscopy and go down into his lungs and
> suck out fluid and look at it under a microscope.  I think
> they felt it smells like PCP, the man has a CD4 cell count
> that puts him in the range for developing PCP, he comes
> in with bilateral pulmonary infiltrates . . . [s]evere
> hypoxia, low levels of oxygen in his blood, no PCP
> prophylaxis.  Had he been on PCP prophylaxis, then you
> start scratching your head and saying: Unlikely to be PCP.
> What other atypical pneumonia will cause these infiltrates
> in this individual? . . . . Given all those factors together,
> it becomes highly likely, added on to the clinical picture
> and his response to therapy very quickly for PCP . . . that
> the presumed [or clinical] PCP diagnosis is correct.
>
> . . .
>
> [T]his man had the textbook presentation of PCP.
>
> . . .
>
> If this was a board examination and there was a multiple
> choice test, the students would guess the test wrong if
> they answered anything but PCP, despite a bronchoscopy
> not being available.

(Naphcare Def.'s Exhibit I, Wohl Depo., pp. 109-11, 160.)  In fact, Dr. Simon

clinically diagnosed Battiste with PCP and treated him for it until November

18, 2002, and she listed it on the Certificate of Death as one of the causes

of Battiste's death.

Dr. Wohl further testified:

> Q:   Let me ask you this: Do you think his not taking
> antiretroviral therapy for whatever reason,
> contributed to his death?
>
> A:   Yes, I do.  I think that taking antiretroviral therapy
> is key to assisting him with having the immune
> system he'll need to fight the infection.  But I think
> we should be clear.  It didn't - I don't know that not
> taking HIV medicine, if he had been on [D]apsone,
> would have him die on December 29th, 2002; I don't
> think so.
>
> Q:   You just can't say, though?
>
> A:   I would expect that had he been on PCP prophylaxis,
> starting with CD4 cell count of 81, this man would be
> alive over a year - over a year - just based upon
> what we know, just based upon what I see in clinic,
> based upon people walking in with low CD4 cell
> counts.  And I just don't see how even in the era
> before we had these potent HIV medicines, people
> would stay alive for quite a considerable amount of
> time because of the prophylaxis against PCP.

*Id.* at 166-67.  Dr. Simon argues in her brief that Battiste started with a CD4

cell count of 44 more than three years prior to his death, meaning that he

lived far beyond the "year" that Dr. Wohl would have expected him to live

had he been taking Dapsone in November and December of 2002.  (Doc. 439,

pp. 10-11.)  Battiste's CD4 cell count was lower than 81 at the time he was first diagnosed, and  Dr. Wohl admitted at his deposition that given the stage of Battiste's disease, he could not offer an opinion with any degree of medical certainty how long Battiste might survive.  (Naphcare Def.'s Exhibit I, Wohl Depo., pp. 82-83, 91-92.)  According to Dr. Simon, Dr. Wohl "conceded that his speculation regarding life expectancy of a patient with advanced AIDS 'comes from his common sense' rather than any studies and/or peer reviewed literature."  (Doc. 439, p. 12.)  However, Plaintiff correctly notes that it is not her burden to prove how long Battiste should have lived once he came under the care of Dr. Simon.  (Doc. 469, p. 15.)  She must only show by substantial evidence that Dr. Simon breached the applicable standard of care and that the alleged failure or breach probably caused Battiste's death.  *McAfee*, 641 So. 2d at 267.  Also, it appears from the testimony as a whole, and not just the portions relied upon by Dr. Simon in her brief, that Dr. Wohl's statement regarding the one year life expectancy was directed at one year from September 23, 2002, when Battiste came under Dr. Simon's care, and not from 1999.  In fact, during his second deposition, Dr. Wohl clarified by saying, "I think looking at Mr.

Battiste when he came in to Limestone Prison, I would say that [to a] reasonable medical degree of certainty that he could have lived for years, plural of years.  Not months.  I think that would be reasonable."  (Naphcare Def.'s Exhibit I, Wohl Depo., p. 204.)

The Court notes that when Battiste arrived at Limestone in June of 2002, he was in the advanced stages of AIDS with a CD4 count of 81 and a viral load of over 500,000.  Also, Dr. Simon's HIV/AIDS resistance tests in August 2002 demonstrated that Battiste's disease was resistant to multiple HIV/AIDS medications, and she had to take Battiste off all of his medications on September 4, 2002, due to a severe allergic reaction.  Further, on September 24, 2002, Dr. Simon attempted to restart Battiste on his medications, and he experienced another allergic reaction.

Dr. Wohl stated in his expert report that Dr. Simon's alleged acts of medical negligence led to a progressive condition of PCP pneumonia from which Battiste never fully recovered:

> Regardless of the wisdom of discontinuing all of Mr. Battiste's medications [on September 4, 2002], the greatest failure on the part of Dr. Simon at this point was her neglecting to restart Dapsone or initiate an alternative PCP prophylaxis while evaluation of the reaction continued,

> including subsequent to the resolution of the reaction. Indeed, based on the medical records and her own medical record entries, Dr. Simon did not appreciate that her patient was vulnerable to opportunistic infections such as PCP . . . .  <u>The prolonged failure to place Mr. Battiste on PCP prophylaxis led to his vulnerability to this infection . . .,</u> his development of PCP and his need for hospitalization.   Moreover, this episode of PCP, as documented in the records, led to a progressive decline in Mr. Battiste's health from which he never recovers.

(Pl.'s Exhibit 47, Wohl Expert Report (emphasis added by Plaintiff).)

Plaintiff directs the Court's attention to Dr. Wohl's statement that it was the "prolonged failure" of Dr. Simon during September and October of 2002 to place Battiste on PCP prophylaxis which "led to a progressive decline in Mr. Battiste's health from which he never recovers." (Doc. 469, p. 8.) Dr. Wohl testified that he "could say with . . . reasonable medical certainty" Battiste would likely have lived "beyond the time period that he did if he received proper medical care." (Naphcare Def.'s Exhibit I, Wohl Depo., p. 203.)

Plaintiff disagrees with Dr. Simon's contention that Plaintiff cannot meet her burden of proof because she has failed to offer expert testimony which shows that any alleged breach of the standard of care caused

Battiste's death.  (Doc. 469, p. 11.)  In his expert report, Dr. Wohl stated:

(1) that he believed that the PCP episode led to a progressive decline in

Battiste's health from which he never recovered; (2) that the clinical

evidence shows that Dr. Simon neglected to provide PCP chemoprophylaxis

and that PCP is extremely uncommon when PCP prophylaxis is appropriately

administered; (3) that in his expert opinion, the lapses in PCP prophylaxis

"were a major contributing factor" to the PCP episodes; (4) that the late

start of PCP therapy once Battiste reached Limestone, his subsequent

intermittent receipt of medications, and the complete withdrawal of PCP

drugs after November 18, 2002, "led to progressive under-treated PCP which

was the cause of Mr. Battiste's death"; and (5) that it was his conclusion

that the medical care Battiste received was below the standard of care

found in any community in the United States and led to his development of

fatal pneumonia.  (Pl.'s Exhibit 47, Wohl Expert Report.)

Even though the Court is aware that Ms. Watkins bears the burden of

proving that the defendants' acts of medical negligence caused Battiste's

death, it is telling that Dr. Simon has not attempted to provide an

alternative theory for Battiste's death or rebut Dr. Wohl's testimony with either her own expert or her own testimony.

Plaintiff has presented substantial evidence, through the expert testimony of a similarly situated health care provider, that Dr. Simon's conduct breached the standard of care and was the proximate cause of Battiste's death.  *See Brooks v. Goldhammer*, 608 So. 2d 394, 395 (Ala. 1992).  An action "may properly be submitted to the jury where there is evidence that prompt diagnosis and treatment would have placed the patient in a better position than she was in as a result of her inferior medical care." *Parker v. Collins*, 605 So. 2d 824, 826 (Ala. 1992).

(2)    Nurses Smith, Barnes, and Jones.

Even though Dr. Wohl is of the opinion that the acts and/or omissions of Dr. Simon are the most direct cause of Battiste's death, Ms. Watkins contends that the acts and/or omissions of the defendant nurses were a contributing cause.[8]  Plaintiff correctly points out that Alabama law is clear that the negligence of one person need not be the sole cause of injury in

_____

[8]Plaintiff admits that "[t]here is no question that Defendant Simon's acts of medical negligence were the most direct cause of Mr. Battiste's death."  (Doc. 458, p. 3.)

order to hold the negligent individual liable.  It is sufficient that his or her negligence "concurring with one or more efficient causes . . . is the proximate cause of the injury."  *Lawson v. General Telephone Co. of Alabama*, 267 So. 2d 132 (1972) (quoting *Shepard v. Gardner Wholesale, Inc.*, 256 So. 2d 877 (1972), and *Chambers v. Cox*, 130 So. 416 (1930)).  However, Plaintiff must still provide "evidence (in the form of expert testimony) which would convince an unprejudiced thinking mind of the truth of the fact to which the evidence is directed."  Ala. Code § 6-5-542(5).

Ms. Watkins first contends that the medical records at issue in this case are in most instances completely indiscernible.  (Doc. 456, p. 7.)  She quotes the nursing defendants' own expert, Ruth Lynch, RN, as saying, "The documentation contained in this record is less than optimal and does not meet the accepted standard of care in several respects . . . . They were less than diligent in their approach to documentation regarding nursing practices."[9]  (Pl.'s Exhibit 43, Nurse Lynch Expert Report, p. 15.)  One of

---

[9]However, Ms. Watkins left out Nurse Smith's statement that:

> after careful analysis and review of all aspects of this record, I am of the opinion that the nursing staff was not dispassionate, apathetic or uncaring in their treatment of Mr. Battiste . . . . I see

Naphcare's experts, Dr. Bergman, testified that the documentation is so

inconclusive that medications ordered for Battiste may not have actually

been administered:

> Q:    Well, do you think Doctor Simon should have or do
>        you know based on Doctor Simon's testimony
>        whether or not she knows Russell ever received any
>        of those PCP medications in October?
>
> Counsel for Naphcare: Objection to the form.
>
> A:    I heard from her testimony that she didn't know
>        either.
>
> Q:    Does that concern you at all?
>
> A:    Oh, it is a concern all right.
>
> Q:    Well, why does that concern you?
>
> A:    Because we mentioned that even though it is not
>        highest on my differential of what this patient had
>        caused his pnuemonitis, as opposed to pneumonia,
>        if he had PCP . . . then not getting treated for
>        multiple days is indeed a problem.  And we don't
>        even know if he didn't receive treatment.  All we
>        know is the documentation is inconclusive.

(Pl.'s Exhibit 38, Bergman Depo., pp. 321-22.)   Dr. Bergman further

testified:

> Q:    Right. But do you know as we sit here today whether
>        or not he received PCP medication that was

---

no evidence that the nursing care and treatment provided to Mr.
Battiste contributed to his death.

(Pl.'s Exhibit 43, Nurse Lynch Expert Report, p. 15.)

> prescribed to him once he was returned to
> Limestone Prison?
>
> A:   Well, I have the dates but I can't - I don't pretend
>       that I can make them out.  First, the carbon copy is
>       not good.  And second, I can't read the handwriting.

*Id*. at 319.  Plaintiff identified Joey Upland, RN, as an expert in nursing to

provide opinions regarding the applicable standard of care for nurses as well

as any alleged deviations from that standard by the defendant nurses.  In

her expert report, Nurse Upland adds:

> It is critical for HIV patients to receive properly
> administered medications.   Adequate and proper
> documentation of medications given is equally critical.  My
> review of the medical records in this case reveals that
> there are literally hundreds of medication administration
> errors and many deviations from standards of basic nursing
> practice regarding the administration of medications to
> Mr. Battiste in Limestone.
>
> . . .
>
> Hundreds of doses of essential medications were not given.
> Documentation of medication not given was left blank, or
> else was poorly documented in general as "not in stock" or
> patient "refused."
>
> . . .
>
> Entirely absent are documented attempts by nursing to
> obtain unavailable medications.

. . .

Documentation procedures for patient refusal of medications are not done at all . . . .

. . .

There is no nursing documentation reporting missed or unavailable doses to physicians.  There is no nursing documentation reporting of unavailable medications to pharmacy.  There is no nursing documentation of reporting missed or unavailable medications to nursing supervisors.

(Pl.'s Exhibit 44, Nurse Upland Expert Report, pp. 7-10.)

Once Plaintiff was provided with the scheduling duty logs, she claims that Nurse Upland was able to discern that the defendant nurses "habitually failed to record a daily per shift narrative note on the care, treatment and condition of Mr. Battiste . . . ."  (Pl.'s Exhibit 45, Upland Affidavit, p. 9.) According to Plaintiff, they failed to perform a daily per shift narrative note while Battiste was in the infirmary from September 4-5, 11-13, 16, 18-19, 25-26, 30, 2002; October 2-3, 18, 20-22, 24-27, 29-31, 2002; and November 1-2, 2002.  (Naphcare Def.'s Exhibit G, pp. 191-94.)  Plaintiff also notes that LPNs Barnes and Jones failed on several occasions to document in narrative text Battiste's medical condition, even though he was experiencing high,

fluctuating temperatures.  (*See* Pl.'s Exhibit 36, 45; Naphcare Def.'s Exhibit

45.)  Plaintiff argues that the nursing notes in Battiste's file from September

2002 through December 2002 are inadequate to provide a useful clinical

picture of the condition and response to treatment Battiste either was or

was not receiving for PCP and HIV, and any subsequent response to those

treatments.  Dr. Wohl offered the following in his expert report regarding

the importance of accurate documentation:

> [E]xplanatory notes regarding interruption of therapy are required according to the MAR instructions, Naphcare policy, and basic standards of care.  Similarly, there is no documentation of communication between Dr. Simon and the nursing staff even when the medical records suggest major problems with the procurement and administration of essential antibiotic or antiretroviral therapies.  While the MARs indicate Mr. Battiste refused medication, there is no documentation in the nurse's notes or elsewhere in the medical records that this was reported to Dr. Simon.
>
> Refusal to accept life-prolonging medication is a serious issue that requires intervention on the part of the medical staff.  Failure to document communication between the nursing and medical staff in these alleged instances of medication refusal suggests that a) in these instances Mr. Battiste actually did not refuse medication and there were alternative undocumented reasons for his not receiving medication, b) that there was poor communication between the nurses and Dr. Simon and or c) that

> documentation of such communication was inadequate and below the standards of care.

(Pl.'s Exhibit 47, Wohl Expert Report, p. 22.)  Plaintiff has established that the documentation in Battiste's medical record was below the standard of care, but the Court has not been provided with expert testimony which shows that the problems with the documentation actually caused Battiste's death.   It is not enough to point to Dr. Wohl's testimony that such documentation is important - there must be testimony that the nurses' failure to provide adequate documentation actually led to, or contributed to cause, Battiste's death.

Second, Plaintiff contends that "[t]he indisputable evidence reveals that Mr. Battiste did not receive his life sustaining Trimethoprim medication when he returned from Huntsville Hospital because, as Defendant Smith testified, Naphcare only had the medication IV, and could not or was not willing to pay to obtain it in pill form."  (Doc. 456, p. 12.)  Battiste was prescribed Trimethoprim to treat his PCP upon his return to Limestone on October 24, 2002, and it was ordered to be given three times a day for twenty days, for a total of sixty doses.  (Naphcare Def.'s Exhibit G, pp. 218

and 226.)  While it is true that Dr. Simon ordered additional medications to treat Battiste's PCP on October 29, 2002, (Exhibit G, p. 175) she testified that Trimethoprim medication was not discontinued and that Battiste continued to need it for his PCP:

> Q:    Did you think that Russell continued to need Trimethoprim on October the 29th [after you prescribed the other two PCP medications]?
>
> Mr. Cooper:        Object to the form.
>
> A:    Yes.

(Naphcare Def.'s Exhibit E, Simon Depo., p. 244.)  Later in her deposition, Dr. Simon testified that she still does not know if Battiste ever received Trimethoprim medication:

> Q:    How many - we've already looked at this, but we'll look at it again.  How many doses of the Trimethoprim does it appear that Russell received from 10/24 to 10/31?
>
> A:    It appeared that he had all stars?
>
> Q:    Or blanks; is that right?
>
> A:    Stars and blanks.
>
> Q:    Okay.  Let's flip over to the next page.  Can you read what the nurses' note says?
>
> A:    Trimethoprim not available.
>
> Q:    All right.  Let's flip over two more pages.  Three more pages, I'm sorry.  This document's got a Roman numeral 2 at the top.  And this appears to be when - or from November the 1st 2002 to November the 30th 2002.  Do you agree?

A:    Yes.

Q:    Now, can you tell me whether it was administered?

A:    I don't know. I can tell you what I see.

Q:    Okay, tell me what you see.

A:    I see some Bs, maybe two Bs and a bunch of stars.

. . .

A:    Okay. 9:30 I see a lot of blanks and three stars.

Q:    Now, what does that mean?

A:    I don't know what it means.

Q:    Well do you think Russell received those medications?

Mr. Cooper:       Object to the form.

A:    It doesn't say he did receive them.

Q:    Does that concern you that one of your patients didn't receive his medication?

A:    It would concern me, and it did concern me whenever I knew somebody wasn't receiving medication.

*Id*. at 244-46. Plaintiff asserts that LPN Smith testified at her deposition that the medication was never administered because the order was "unclear" and that the stars in the MAR were her short hand way of documenting the same. (Doc. 456, p. 15.) LPN Barnes also testified that Trimethoprim was never provided to Battiste. (Pl.'s Exhibit 57, Barnes Depo., pp. 64-65.)

LPN Smith further clarified that the Trimethoprim order was "unclear" because Naphcare only had the medication IV and that Naphcare did not have it in pill form. (Naphcare Def.'s Exhibit G, p. 219.)  She testified that when medication was unavailable she would normally "speak to the doctor who wrote the order" or inform the "charge nurse."  (Naphcare Def.'s Exhibit N, Smith Depo., p. 90.)  If she did not receive a satisfactory answer, she would "call Dr. Simon."  *Id.*  Based on the duty logs produced by Naphcare, Plaintiff notes that LPN Smith worked at Limestone and was responsible for administering Battiste's Trimethoprim on October 29, 2002, twice on October 30, 2002, and on November 3, 5, and 12, 2002.  (Naphcare Def.'s Exhibit G.)  According to Plaintiff, each time LPNs Smith and Barnes went to the chart they obviously confirmed: (1) the medication had not been discontinued; (2) it was still unavailable and Battiste had not received it; and (3) they memorialized this fact with either " " or "*" in the MAR.  *Id.* at 219.  The MAR includes forty entries of a "*", which by LPNs Smith and Barnes' own admission were used to indicate that the medication was not available.  (Naphcare Def.'s Exhibit N, Smith Depo., p. 72; Pl.'s Exhibit 57, Barnes Depo., pp. 64-65.)  According to Nurse Upland, the failure to provide

Battiste with Trimethoprim was a breach of the standard of care, and Dr. Wohl testified that the failure to provide the medication was a cause of Battiste's death.[10]  (Pl.'s Exhibits 44, 45, & 47.)

In their reply briefs, LPNs Smith and Barnes note that on October 29, 2002, Dr. Simon ordered a regimen of Clindamycin and Primaquine in place of Trimethoprim and Dapsone.  (Naphcare Def.'s Exhibit G, p. 175.)  In fact, this was exactly the treatment regimen initially selected by the doctors at Huntsville Hospital.  (Naphcare Def.'s Exhibit H, pp. 7, 13.)  Plaintiff's own expert, Dr. Wohl, testified that it is reasonable to treat PCP with a combination therapy of Clindamycin and Primaquine.  (Naphcare Def.'s Exhibit I, Wohl Depo., pp. 69-70.)  The record indicates that LPN Smith

_____

[10]Dr. Wohl stated in his expert report:

> The late start of PCP therapy after Mr. Battiste's return to Limestone Prison from the hospital, his *subsequent intermittent receipt of even these medications* and the complete withdrawal of PCP active drugs after November 18, 2002, *each*, in my opinion, led to the progressive undertreated PCP which was the cause of Mr. Battiste's death.  These events and the medical record lead me to the opinion that the medical environment at Limestone prison was suffering from an absence of oversight of patient care, poor communication among staff, inadequate documentation and shortage of medication.

(Pl.'s Exhibit 47 (emphasis added).)

administered Battiste's medications in accordance with Dr. Simon's October 29, 2002 order.  This does not, however, explain why Dr. Simon testified that Battiste continued to need Trimethoprim on October 29, 2002, or why there were notations in the record indicating that medication was either unavailable or not administered.  Dr. Simon testified that she saw the stars and blanks on Battiste's record, but she did not know what they represented.  It is unclear whether the stars and blanks appeared on a part of Battiste's record that would have been frequently reviewed by Dr. Simon. If they did appear on such a record, then a reasonable person would expect Dr. Simon to inquire into the meaning of the stars and blanks.  However, if the notes were simply made in the nurse's own records, then one would expect the nurses to inform Dr. Simon that her prescribed medication was unavailable.  There appears to be a genuine issue of fact as to whether Dr. Simon was ever informed that Trimethoprim was unavailable, either through the notations in the medical record or otherwise.

The defendant nurses point out that when asked to identify the specific acts of negligence committed by them in this case, Plaintiff's expert, Nurse Upland could not list them:

Q:     Here's why I'm asking: Under the Alabama Medical
        Liability Act the Plaintiff is required to name in the
        complaint against any health care provider each act
        or omission that they say constitutes a deviation
        from the standard of care.  Now, I want to ask you
        whether you have done that and whether you can
        list for me today with regard to the nurses that have
        been sued, which are Ms. Cook, Ms. Barnes and Ms.
        Smith, let's start with those three, have you done
        that with regard to those three?

A:     I looked at some specifics of what those nurses did.

Q:     But you can't list them for me here today, can you?

Mr. Twombley:   Object to the form.

The Witness:    I can't rattle them off verbally off the
                top of my head.


        . . .


The Witness:    There were problems with all of the
                nursing care that was given by all of
                these nurses.

Mr. Cooper:     You just haven't taken the time to list
                them out in a written report or in any
                notes, correct?

A:     I did not make that part of my report.

Q:     While it may not be in your report, did you list it
        anywhere?

A:     No.

Q:     As to any particular nurse?

A:     No.

Q:     You haven't done that even as we sit here today?

A:     I have not made lists.  I have not made notes.

Q:     You can't tell me with out going through now each
        page of the record each act or omission that you say
        constitutes malpractice, is that correct?

> A:   I can tell you by going through all of these records each and every page if I have found a deviation from the standard of care or not.

(Naphcare Exhibit R, Upland Depo., pp. 103, 109-10.)  Even though Nurse Upland could not list specific breaches for defense counsel during the deposition, as shown in the preceding paragraphs and the following sections, she has identified instances where she believes the defendant nurses deviated from the standard of care.

### (a)   Nurse Smith.

Plaintiff offers: "Dr. David Wohl[] has opined that it is his opinion Mr. Battiste's death was directly caused by Defendant Simon, and that Defendant Smith, based upon the deviations in the standard of nursing care identified by Nurse Upland, was a contributing cause in Mr. Battiste's death."[11]  (Doc. 456, p. 2.)  As noted above, whether LPN Smith failed to

---

[11] A licensed physician is qualified to provide testimony as to medical causation. *See, e.g., Nelson v. Elba General Hosp. and Nursing Home, Inc.*, 828 So. 2d 301, 304 (Ala. Civ. App. 2000), *rev'd on other grounds*, 828 So. 2d 308 (Ala. 2001) ("Although a registered nurse may be qualified to testify as to the standard of care that exists in the field of medicine applicable to registered nurses and as to whether that standard of care was breached, a registered nurse is not qualified to testify as an expert with regard to medical causation.").  Even though Dr. Wohl is not competent to testify as to whether LPN Smith deviated from the standard of care, his testimony is relevant to the extent it seeks to show how specific deviations in LPN Smith's care contributed to cause Battiste's death.

notify Dr. Simon that Trimethoprim was not available and whether she administered the medications to Battiste as ordered remains an issue of material fact.  Also, Plaintiff has offered the expert testimony of Dr. Wohl and Nurse Upland, who testified that such failures are a deviation from the standard of care and that such a deviation was a contributing cause of Battiste's death.[12]

(b)    Nurse Barnes.

Nurse Upland offers three basic criticisms of LPN Barnes' care: (1)that she practiced outside the scope of her license when she increased Battiste's oxygen flow rate in order to improve his oxygen saturation; (2) that LPN Barnes should have called a physician or RN instead of Physician's Assistant Eby; and (3) for not properly recording her observations of Battiste's condition in the medical chart on September 5, 2002.  (Naphcare Def.'s Exhibit R, Upland Depo., pp. 144-56.)  She testified:

```
Q:    Do you know who Ms. Barnes is?
A:    Ms. Barnes is an LPN.
Q:    Do you know when she worked there?
A:    I saw her name in infirmary notes and nurse's notes?
```

---

[12]*See supra*, note 9.

. . .

Q:   Okay. What else you got on Ms. Barnes?

A:   D. Barnes, all right, on 9/21, 12:30 a.m., patient called nurse to the room.  He complains of difficulty breathing, shortness of breath and pain in his chest . . . .   The first portion of what she charts indicates the patient's in severe respiratory distress. he is starving for oxygen.  He is air hungry.  His O2 sat is 60 percent.  That's a very serious symptom. She doesn't phone a physician.  She doesn't call an RN to come and assess the patient.  She just tells him take a deep breath and things - and his sat goes up to 85, which he is still hypoxemic.  She calls Ms. Eby,  the  Physician's Assistant.   A  Physician's Assistant by licence cannot give telephone orders. Another problem with -

Q:   Nurses can't admit and discharge patients either?

A:   Well, in general infirmaries -

Q:   Well, you do it?

A:   It's a part of standard of care in a jail infirmary.  It's not a hospital bed.  They're not the same.

. . .

Q:   Why do you think Ms. Barnes did what she did?

A:   I can't speak for why Ms. Barnes did or didn't do. Obviously there's lack of training in this facility of these nurses.  There's a lack of supervision.  She's clearly  not  being  supervised  as  she  should  be. There's  a  lack  of  anybody  following  Naphcare policies and standards.  There's many problems with this.  But to walk out and -

Q:   Just raise your hand when you finished your answer so I can ask my next question.

A:      It's cruel.  It's very cruel.  That's what nurses are there for.

Q:      So from your assessment it's your opinion that Ms. Barnes is cruel and was to Mr. Battiste?

A:      In this instance this was a cruel thing to do.

. . .

Q:      Okay, what else you got on Ms. Barnes?

A:      So she stays with the patient, this is 45 minutes after, she stays, his 02 sat increased to 95 percent.

Q:      Is that good?

A:      Well, it was an improvement.  Nothing else was done.

Q:      Better than what he had when he left Huntsville Hospital wasn't it?

A:      It's approximately the same but you're isolating -

Q:      You got me.  95 is better than 94 isn't it, you'll give me that, won't you?

A:      He's in severe distress.  He was not in severe respiratory distress when he left Huntsville Hospital.

Q:      What else you got on Ms. Barnes?

A:      He clearly is when Ms. Barnes is looking at him.

Q:      Even when his oxygen's sat is 95 percent?

A:      Nothing was done to correct his underlying problem.

(Naphcare Def.'s Exhibit R, Upland Depo., pp. 106, 145-46, 156-58.)  Nurse Upland identified one more instance where she believes LPN Barnes should have called an RN for assistance.  *Id*.

A genuine issue of material fact remains regarding whether LPN Barnes administered the medications as ordered and whether she informed Dr.

Simon that Trimethoprim was unavailable.  Plaintiff offers the testimony of

Dr. Wohl and Nurse Upland to show that LPN Barnes' actions breached the

standard of care and that her breach was a contributing cause of Battiste's

death.[13]  However, Plaintiff has not provided evidence that the remaining

alleged breaches identified by Nurse Upland caused, or contributed to cause

Battiste's death.

(c)    Nurse Jones.

Mary Jones, LPN, contends that there is no substantial evidence of

causation to support Plaintiff's wrongful death claim.  (Doc. 437, p. 7.)

Nurse Upland testified as follows:

> Q:    I understand that you have global criticisms about
> Naphcare nursing, but the individuals that are sued
> have been charged with malpractice and I want to
> know on what basis those particular individuals were
> accused of that.
>
> A:    Well, let's go through some examples then.
>
> Q:    Okay.
>
> A:    I can give you some more specifics.  So on 9-8 in the
> nurse's notes from the infirmary there is an entry by
> Mary Jones at 5 o'clock.  She says subjective, " I
> don't know what's wrong with me" as being what
> Mr. Battiste said.  This is a time period when he was
> admitted for an allergic reaction to one of his HIV

---

[13]*See supra*, note 9.

meds.  She describes that he has a body rash, it's noted on arms, upper trunk, right eye is irritated with dry matter on his lids.  She puts assessment, reaction to medication or chemicals.

This is outside of the standard of care.  An LPN is outside their scope of practice formulating an assessment and a decision including a plan what to do based on the nursing process.  So here she's outside her scope of practice.

She doesn't - she decides to continue to administer meds as ordered and observed.  So her assessment is - is problematic.  She's masking assumptions.  I don't understand how she comes to this conclusion.  She doesn't mention what the chemicals are or what his reaction is.  N. Jones, when she says continue to administer meds as ordered, she did not talk to the RN.  When she's making these observations saying he's reacting to medications it's unclear what she means.  Which medication?  His medications were supposedly being held at this time.

. . .

Q:    Okay.  Let's stick with Ms. Jones.  Do you have any other examples for Ms. Jones?

A:    I need to go through each page and find her entries here.  Here's another one on 9-14.  Having night sweats in the past month.  Objective, resting quietly with temp of 98.3, skin warm and dry.  Assessment, night sweats.  Plan, monitor for increased temp.  This is very unclear what she's doing or what she's thinking.  She's not observing any night sweats.  How this issue came up of having night sweats is a very

> unclear record, that he's complained to her that he
> had night sweats in the past month.  And, again,
> she's outside her practice making an assessment that
> that's what she seems to be observing and that she
> will continue to monitor for a temperature for that.
> Again, if he's having night sweats at the time, she
> may have needed to call a physician.  She may have
> needed to look at the temperature records.

(Naphcare Def.'s Exhibit R, Upland Depo., pp. 124-25, 128.)  LPN Jones

contends that Plaintiff has failed to identify how these alleged breaches

caused Battiste's death.  She offers that Battiste's "death was not in any

way related to the care provided by Nurse Jones."  (Doc. 437, p. 12.)  She

argues that "the plaintiff has failed to offer competent, substantial

evidence that Nurse Jones proximately caused the plaintiff's complained-of

injuries . . . ."  (Doc. 499, p. 3.)

Nurse Upland was able to provide the following as examples of LPN

Jones' breaches of the standard of care: (1) failure to conduct evaluations

of Battiste; (2) failure to record a daily shift narrative note on the care

Battiste received; and (3) the overall treatment and condition of Battiste

while he was inpatient in the Limestone infirmary.  (Doc. 457, p. 7.)  The

Court agrees with defendant Jones.  Plaintiff has provided evidence that

LPN Jones failed to document Battiste's medical condition in narrative text and that such a failure falls below the standard of care; however, she has not provided expert testimony which shows that such a breach caused or contributed to cause Battiste's death.  Nurse Upland's assertion that the overall treatment Battiste received at Limestone is likewise insufficient to meet Plaintiff's burden of providing substantial evidence of causation through expert testimony.

For these reasons, LPN Jones is entitled to summary judgment as to Plaintiff's AMLA claims against her.

c.      Rule 702 and *Daubert*.

The Court must apply the Federal Rules of Evidence when determining the admissibility of proffered expert medical testimony even where, as here, State law provides the substantive law of the case.  *See McDowell v. Brown*, 392 F.3d 1283, 1294 (11th Cir. 2004).  Even where the admissibility of expert testimony in establishing the standard of care and that a breach of that standard occurred is governed by state substantive law, this Court must nonetheless engage in Rule 702 analysis concerning whether to admit

the expert testimony.  *Id.* at 1295 (quoting *Legg v. Chopra*, 286 F.3d 286,

292 (6th Cir. 2002)).  Rule 702 provides:

> If scientific, technical, or other specialized knowledge will
> assist the trier of fact to understand the evidence or to
> determine a fact in issue, a witness qualified as an expert
> by knowledge, skill, experience, training, or education,
> may testify thereto in the form of an opinion or otherwise,
> if (1) the testimony is based upon sufficient facts or data,
> (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles
> and methods reliably to the facts of the case.

Fed. R. Evid. 702.  Referring to the United States Supreme Court's seminal

opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579

(1993), the Eleventh Circuit noted that district court judges assume a

gatekeeping role requiring them to "'ensure that any and all scientific

testimony or evidence is not only relevant, but reliable.'" *McDowell*, 392

F.3d at 1298 (quoting *Daubert*, 509 U.S. at 589)).  The *McDowell* Court

continued:

> *Daubert* put forth a two-pronged analysis, used to
> determine the admissibility of the proffered expert
> testimony on scientific issues under Rule 702. First, the
> expert testimony must be reliable, so that it must be
> "scientific," meaning grounded in the methods and
> procedures of science, and must constitute "knowledge,"

meaning something more than subjective belief or unsupported assumptions.

*Daubert*'s reliability prong sets out four guideposts that a district court may consider in assessing the reliability of the expert testimony, which include, but are not limited to: (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the technique has been subjected to peer review and publication; (3) the known and potential error rate of the methodology; and (4) whether the technique has been generally accepted in the proper scientific community. In addition, other factors that a court may consider in the *Daubert* analysis are "reliance on anecdotal evidence (as in case reports), temporal proximity, and improper extrapolation (as in animal studies)." Finally, a court should meticulously focus on the expert's principles and methodology, and not on the conclusions that they generate.

The second prong of the *Daubert* analysis requires that the proposed testimony be relevant. To meet this requirement, the expert testimony must be "'relevant to the task at hand,' … i.e., that it logically advances a material aspect" of the case. The relevance requirement is not satisfied where the proffered testimony does not assist the trier of fact. The relationship must be an appropriate "fit" with respect to the offered opinion and the facts of the case. Under *Daubert*, scientific testimony does not assist the trier of fact unless the testimony has a justified scientific relationship to the pertinent facts. For example, there is no fit where a large analytical leap must be made between the facts and the opinion.

*McDowell*, 392 F.3d at 1299 (internal citations omitted).  In *McDowell*, the plaintiff, a former inmate, claimed that the delay in treating his spinal epidermal abscess caused or worsened his condition.  *Id*.  The plaintiff's proffered expert offered what the district court termed "the earlier, the better" theory as to the plaintiff's treatment.  *Id*.  The Court held that the theory was "too vague" to assist the trier of fact, and it ultimately precluded the testimony because the expert could not identify any empirical data, survey, study, or literature to support his theory, save one study which did not involve the same amount of time regarding the delay in treatment.  *Id*. at 1300.  The Court excluded a second expert's testimony which was based on conclusions where there was no existing data.  "A mere guess that earlier treatment would either have improved [the plaintiff's] condition or rendered it the same simply fails the tests for expert opinion."  *Id*. at 1301.

Dr. Simon challenges Dr. Wohl's testimony on the grounds that it does not satisfy the requirements of Rule 702 of the Federal Rules of Evidence.  Dr. Simon contends that Dr. Wohl's opinions in this case lack testing, peer review, potential error rate, and general acceptance by the scientific community.  (Doc. 439, pp. 13-14.)  She argues that like the experts in

*McDowell*, Dr. Wohl did not identify any empirical data, surveys, or studies to support his conclusion that Battiste's chances of survival would have been greater had he been treated with PCP therapy after he returned to Limestone from Huntsville Hospital on October 24, 2002, nor has he established that he has tested this theory or determined any error rate associated with it. (Doc. 439, p. 16.) Dr. Simon specifically focuses on Dr. Wohl's testimony that his opinions "come from sort of common sense." (Naphcare Def.'s Exhibit I, Wohl Depo., pp. 88-89.) However, at the point when Dr. Wohl used the phrase "common sense," he and counsel for Dr. Simon were discussing a hypothetical AIDS patient posited by Dr. Simon's attorney. *Id*. During his deposition, Dr. Wohl specifically testified that there are several different studies to support his contention that Battiste's life expectancy exceeded the time of his actual death. *Id*. at 89.

Dr. Wohl contends that Dr. Simon's failure to appropriately prevent and treat Battiste's PCP ultimately caused his death. In reaching his conclusion, as set forth in the sections above, Dr. Wohl made a differential diagnosis that Battiste was suffering from PCP by examining the medical records, and he determined, based upon his own experience with patients,

that PCP prophylaxis could have prolonged Battiste's life.  It is clear from

Dr. Wohl's expert report, affidavits, and depositions that he relied heavily

upon Battiste's medical records, the clinical diagnoses of Battiste's treating

physicians, guidelines and reports dealing with the diagnosis and treatment

of HIV infected adults, and his own extensive experience in dealing with

similarly situated HIV/AIDS patients when formulating his opinions in this

case.[14]  It appears to the Court that Dr. Wohl's medical opinions are based

---

[14]In his expert report, Dr. Wohl identified the following as information and data
which he relied upon in forming his opinions:

1.  [Battiste's] Medical Record
2.  Medical Records from Limestone Prison
3.  Hospital Records Produced by Huntsville Hospital
4.  Magistrate Judge's Report and Recommendation - Leatherwood v. Campbell CV 02-BE-2812-W
5.  Supplemental Report of Stephen Tabet, M.D., MPH
6.  Depositions of NAPHCARE, Limestone personnel
7.  Naphcare Inc. Policy and Procedure Manual
8.  Naphcare Inc. Nursing Protocols
9.  Current and previous versions of the U.S. DHHS Guidelines for the Use of Antiretroviral Agents in HIV-Infected Adults and Adolescents
10.  Current and previous versions of USPHS/IDSA Guidelines for the Prevention of Opportunistic Infections in persons Infected with HIV
11.  Relevant NCCHC guideline including Clinical Guideline for Correctional Facilities: management of persons with HIV Infection
12.  Other discovery materials provided by plaintiffs (sic) council (sic), including Mobile Metro jail (sic) documents.

on empirical data, medical studies, and accepted medical practices.  His

opinion that Battiste could have lived beyond December 29, 2002, had he

received the proper medication in a timely manner does not appear to be

a "mere guess."  His testimony advances Plaintiff's theory of causation and

appears to be helpful to the trier of fact.  For these reasons, Dr. Wohl's

testimony survives Dr. Simon's *Daubert* challenge and is admissible to prove

alleged deviations from the standard of care and causation in this case.

The defendant nurses have also challenged Nurse Upland's testimony

and opinions in this case based upon the assertion that they are not

admissible under Rule 702 and the Supreme Court's holding in *Daubert*.  Like

Dr. Wohl, Nurse Upland appears to base her opinions on a review of

Battiste's medical records, depositions of the defendants, and her own

extensive experience in nursing, most notably nursing in the correctional

setting.[15]   The Court disagrees with the defendants' assertion that her

---

(Pl.'s Exhibit 47, Wohl Expert Report.)

[15]Nurse Upland identified the following "non-exhaustive" list of materials which
she reviewed for preparation of her opinions in this case:

  1.   The University of South Alabama Hospital Medical Records;
  2.   Mobile County Health Department Medical Records;
  3.   Naphcare Inc. Nursing Protocol, undated, unsigned;

testimony is "too vague" to assist the trier of fact.   Nurse Upland's testimony is relevant to the standard of care applicable to the nurse defendants as well as their alleged breaches of that standard.   The Court recognizes, however, that her testimony is not relevant to the issue of causation.

B.     Section 1983 Claims.

1.     Eighth Amendment Violations: Deliberate Indifference.

Plaintiff alleges that defendants Naphcare, Henderson, Simon, Smith, Jones, Barnes, Haley, Cavanaugh, Mitchem, Wise, the City of Mobile, and Sheriff Tillman acted with deliberate indifference to Battiste's serious medical needs.  The Eighth Amendment governs the conditions under which convicted prisoners are confined and the treatment they receive while in

---

4.     Naphcare, Inc., Policy and Procedure Manual, effective Jan. 2001, unsigned;

5.     Limestone Prison Medical Records;

6.     Huntsville Hospital Medical Records;

7.     Review records of Limestone Correctional Facility;

8.     Various documents related to Naphcare staff meetings, audits, internal administrative memos and other records;

9.     Personnel files of Naphcare medical staff;

10.    Depositions of Limestone medical staff;

11.    Discovery Material.

(Pl.'s Exhibit 44, Upland Expert Report, pp. 4-5.)

prison.  *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Helling v. McKinney*, 509 U.S. 25, 31 (1993)); *see also Whitley v. Albers*, 475 U.S. 312, 327 (1986) (holding that "the Due Process Clause affords . . . no greater protection").  While "[t]he Constitution 'does not mandate comfortable prisons,'" it does not "permit inhumane ones."  *Id.* (internal citations omitted).  The Amendment requires prison officials to provide "humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmate.'" *Id.* (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-57 (1984)).  However, not "every governmental action affecting the interest or well-bring of a prisoner" is to be scrutinized by the courts; rather, "[a]fter incarceration, only the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment."  *Whitley*, 475 U.S. at 319 (quoting *Ingraham v. Wright*, 430 U.S. 651, 670 (1977)) (internal quotation marks omitted).

The government has an obligation to provide medical care to those it incarcerates.  *See Estelle v. Gamble*, 429 U.S. 96, 103 (1976).  Deliberate

indifference to the serious medical needs of inmates constitutes the "'unnecessary and wanton infliction of pain'" prohibited by the Constitution.  *Id.* at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)).  In *Estelle*, the Supreme Court held that a prison physician's "negligen[ce] in diagnosing or treating a medical condition" was not sufficient to establish a claim of deliberate indifference under the Eighth Amendment.  429 U.S. at 106.  Medical malpractice is not a constitutional violation simply because the victim is a prisoner.  *Id.*  The inmate must establish acts or omissions "sufficiently harmful to evidence deliberate indifference to serious medical needs."  *Id.*; *see also McElligott v. Foley*, 182 F.3d 1248, 1254 (11th Cir. 1999).  The Supreme Court noted in *Estelle* that the plaintiff's primary allegation was that "more should have been done" to diagnose and treat a back injury.  *Id.* at 107.  The Court explained, "a medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.  At most it is medical malpractice . . . ."  *Id.*  Deliberate indifference to an inmate's serious medical needs "is shown when prison officials have prevented [him] from receiving recommended treatment or when an inmate is denied access to medical

personnel capable of evaluating the need for treatment." *Ancata v. Prison*

*Health Services, Inc.*, 769 F.2d 700, 704 (11th Cir. 1985).

The Supreme Court rejected a purely objective test for deliberate

indifference, adopting instead a standard which includes both objective and

subjective components.

> We hold . . . that a prison official cannot be found liable
> under the Eighth Amendment for denying an inmate
> humane conditions of confinement unless the official
> knows of and disregards an excessive risk to inmate health
> or safety; the official must both be aware of facts from
> which the inference could be drawn that a substantial risk
> of harm exists, and he must also draw the inference . . . .
> An act or omission unaccompanied by knowledge of a
> significant risk of harm might well be something society
> wishes to discourage, and if harm does result society might
> well wish to assure compensation. The common law
> reflects such concerns when it imposes tort liability on a
> purely objective basis. But an official's failure to alleviate
> a significant risk that he should have perceived but did
> not, while no cause for commendation, cannot under our
> cases be condemned as the infliction of punishment.

*Farmer*, 511 U.S. at 837 (internal citations omitted). "It is obduracy and

wantonness, not inadvertence or error in good faith, that characterize the

conduct prohibited by the Cruel and Unusual Punishment Clause, whether

that conduct occurs in connection with establishing conditions of

confinement, supplying medical needs, or restoring control over a tumultuous cellblock." *Whitley*, 475 U.S. at 319; *see also Campbell v. Sikes*, 169 F.3d 1353, 1364 (11th Cir. 1999) ("Proof that the defendant should have perceived the risk, but did not, is insufficient."); *Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996). Therefore, a plaintiff must satisfy both an objective and a subjective inquiry in order to establish that a prison official acted with deliberate indifference. *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (citing *Taylor v. Adams*, 221 F.3d 1254, 1257 (11th Cir. 2000); *Adams v. Page*, 61 F.3d 1537, 1543 (11th Cir. 1995)). The objective component is met by providing evidence of a serious medical need. *Id*. The subjective component requires showing that the official acted "with an attitude of 'deliberate indifference' to that serious medical need." *Id*.

> a.   Serious Medical Need.

In the Eleventh Circuit, a serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994) (internal quotation marks and citations omitted). The medical

need must be "one that, if left unattended, pos[es] a substantial risk of serious harm." *Farrow*, 320 F.3d at 1243 (internal quotation marks and citations omitted).[16]

Battiste's ailments allegedly included the serious medical condition of being vulnerable to opportunistic infections, such as PCP, associated with his AIDS.  The death certificate, signed by Dr. Simon, concluded that he died because of respiratory failure, PCP, AIDS, and wasting syndrome.  It appears to the Court that Battiste clearly suffered from serious medical conditions

---

[16]The Eleventh Circuit has recognized a range of conditions that are sufficient to constitute a "serious medical need" for the purposes of the Eighth Amendment. *Compare Farrow*, 320 F.3d at 1243-44 (finding in certain circumstances that the need for dental care combined with the effects of not receiving it may give rise to a sufficiently serious medical need); *Adams v. Poag*, 61 F.3d 1537, 1539-41, 1543 (11th Cir. 1995) (holding that asthma, with continual breathing difficulties and intermittent wheezing, coughing, and hyperventilating can constitute a serious medical need); *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990) (finding that a painful broken foot can be a serious medical need); *and Aldridge v. Montgomery*, 753 F.2d 970, 972-73 (11th Cir. 1985) (stating that a one-and-a-half-inch cut over the detainee's eye which was bleeding for two and a half hours was a serious medical need); *with Shabazz v. Barnauskas*, 790 F.2d 1536, 1538 (11th Cir. 1986) (holding that the inmate's "shaving bumps," even if shaving is required by prison officials and is ordered by the physician, "does not rise to the level of the cruel and unusual punishment forbidden by the Eighth Amendment"); *and Dickson v. Colman*, 569 F.2d 1310, 1311 (5th Cir. 1978) (determining that the inmate's high blood pressure did not present a "serious threat" to his health).

such that if they were left untreated they posed a serious, even fatal, risk of harm.[17]

        b.    Deliberate Indifference.

To violate the Cruel and Unusual Punishments Clause, the defendant must have a "'sufficiently culpable state of mind,'" and in cases such as this, "that state of mind is one of 'deliberate indifference' to inmate health . . . ." *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). "[O]nly the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Whitley*, 475 U.S. at 319 (quoting *Ingraham*, 430 U.S. at 670 (quoting *Estelle*, 429 U.S. at 103)) (internal quotation marks omitted). In *McElligott*, the Court clarified the three components of deliberate indifference: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence. 182 F.3d at 1255. For example, "an official acts with deliberate indifference when he knows that an inmate is in serious need of medical

---

[17]It does not appear to the Court that Defendants challenge whether Battiste suffered from a "serious medical condition" as that term has been defined by the Eleventh Circuit.

care, but he fails or refuses to obtain medical treatment for the inmate."
*Lancaster v. Monroe County*, 116 F.3d 1419, 1425 (11th Cir. 1997).  Even if
medical care is provided, a prison official may still act with deliberate
indifference "by delaying the treatment of serious medical needs, even for
a period of hours, though the reason for the delay and the nature of the
medical need is relevant in determining what type of delay is
constitutionally intolerable." *McElligott*, 182 F.3d at 1225.  Therefore, in
addition to showing that Battiste suffered from a serious medical need, Ms.
Watkins must demonstrate that: (1) the individual defendants were
deliberately indifferent to that need; and (2) the defendants' deliberate
indifference caused Battiste to suffer harm.  *See Marsh v. Butler*, 268 F.3d
1014, 1058 (11th Cir. 2001) (citing *McElligott*, 182 F.3d at 1254-55).

(1)	Sheriff Tillman.

(a)	Deliberate Indifference.

The only remaining claims against Sheriff Tillman are that he was
deliberately indifferent to Battiste's serious medical needs and that he is

liable under § 1983 in his supervisory capacity.[18]  Plaintiff must establish

that the subjective component of her § 1983 claims is met.  In other words,

Sheriff Tillman must have acted "with an attitude of 'deliberate

indifference' to [Battiste's] serious medical need." *Farrow*, 320 F.3d at

1243.  Liability may only be imposed for deliberate indifference if Ms.

Watkins proves that Sheriff Tillman actually knew of "an excessive risk to

[Battiste's] health or safety" and disregarded that risk. *Campbell*, 169 F.3d

at 1364 (quoting *Farmer*, 511 U.S. at 837).  It is not enough for her to

demonstrate that he "should have known" that Battiste's condition would

deteriorate. *Lancaster*, 116 F.3d at 1425.  In her Supplemental Responses

to Sheriff Tillman's Interrogatories, Plaintiff has admitted that she "cannot

point to affirmative facts and evidence to show that Defendant Tillman had

personal knowledge of Mr. Battiste's medical condition."  (Doc. 399, p. 4.)

In fact, Sheriff Tillman asserts in his affidavit that he did not know Battiste,

never had any conversations with him, and never had any conversations with

any member of Battiste's family.  (Tillman Exhibit 1, Tillman Affid., p. 2.)

Further, Sheriff Tillman asserts that he was not aware of Battiste's medical

---

[18]*See supra* note 3.

condition or his medical needs.  (Doc. 412, p. 5.)  Plaintiff has not produced evidence sufficient to create a genuine issue of material fact regarding the subjective component of her § 1983 claim against Sheriff Tillman.

As Sheriff of Mobile County, Sheriff Tillman admits that he was vested with the legal custody and charge of the Mobile County Metro Jail and its prisoners.  Ala. Code § 14-6-1.  (Doc. 412, p. 5.)  However, it is well established in the Eleventh Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability.  *See Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003).  Instead, supervisory liability under § 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of the supervisor and the alleged constitutional deprivation.  *Id.* That causal connection is established where either: (a) "a history of widespread abuse puts the responsible superior on notice of the need to correct the alleged deprivation, and he fails to do so;" or (b) "when a supervisor's custom or policy results in deliberate indifference to constitutional rights or when the facts support an inference that the

supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Id.* (internal quotations and citations omitted).  Plaintiff does not allege that Sheriff Tillman personally participated in any unconstitutional conduct towards Battiste.  Thus, she must provide evidence that there was a causal connection between his actions, or inactions, and Battiste's alleged deprivations.

One of Plaintiff's experts, Dr. Gottula, has testified that he has no criticisms of the Jail's written policies and procedures.  (Tillman Exhibit 31, Gottula Depo., p. 178.)  Rhoda Manning Juzang, the former Director of Nursing, who was in charge of staffing, testified that the Jail's clinic always had enough nurses to cover the duties that needed to be performed and that there was never a time when she didn't have enough nurses or doctors. (Tillman Exhibit 30, Juzang Depo., pp. 20-21.)  Sheriff Tillman stated in his sworn affidavit that it was also the policy of the Jail that inmates would have access to medical care and that if inmates were being seen by outside physicians for chronic care needs then those inmates would be taken to scheduled appointments with their outside physicians.  (Tillman Exhibit 1,

Tillman Affid., p. 2.)  The evidence demonstrates that Battiste was taken to his scheduled appointments with outside physicians.  As set out in the facts section, *supra*, Battiste was taken by Jail personnel to appointments at the University of South Alabama Medical Center, the Mobile County Health Department, and the office of Dr. Mark Douglas, a retinal surgeon.  Dr. Gottula testified that the Jail complied with the applicable standard of care by transporting Battiste to these scheduled appointments and by continuing his care and treatment with his doctors.  (Tillman Exhibit 31, Gottula Depo., pp. 110-12.)

    The evidence also demonstrates that it was the Jail's policy to fill prescription medications immediately and that they be administered as ordered by the doctor.  (Tillman Exhibit 1, Tillman Affid., p. 2.; Exhibit 28, Peavey Depo., p. 20; Exhibit 29, Tate Depo., p. 25.)   Nurse JoAnn Peavey remembers giving Battiste his medications, and Corrections Officer Arthur Randle recalls that Battiste "took a lot of medication."  (Tillman Exhibit 28, p. 28; Ex. 27, Peavey Depo., pp. 16-17.)   During the course of his incarceration, the Mobile County Metro Jail filled over $48,000.00 worth of prescription medications for Battiste.  (Tillman Exhibits 7 & 21.)   Nurse

Peavey testified that there was never a time in her ten years of working as a nurse at the Jail when medications were not available for a particular inmate.  (Tillman Ex. 28, Peavey Depo., p. 21.)  There is simply no evidence that Battiste was not receiving his medications while he was incarcerated at the Mobile County Metro Jail.

Dr. Wohl, Plaintiff's expert, is of the opinion that Battiste's untreated PCP led to his ultimate death.  Yet, there is nothing to indicate that Battiste developed PCP during his incarceration at the Mobile County Metro Jail, nor is there anything which indicates that Battiste suffered from respiratory failure or wasting syndrome during that time.  (*See* Tillman Exhibit 23, Wohl Depo., pp. 266-68.)

Plaintiff alleges that "there existed a custom at Mobile Metro Jail of not following any of the Mobile Metro Jail policies and procedures."  (Doc. 461, p. 2.)  She believes that a reasonable jury could find that this was the "moving force" behind the failure to regularly and appropriately provide Battiste with his HIV antiretroviral medications.  *Id.*  Plaintiff argues that unlike "traditional § 1983 cases where a plaintiff must prove actual knowledge and appreciation of a substantial risk to survive summary

judgment, when a plaintiff challenges a 'custom' of an official policy maker," a plaintiff may demonstrate liability when the custom: (1) caused a deprivation of rights, and (2) that the challenged practice was so widespread or flagrant that in the proper exercise of their official responsibilities the policymakers should have known of them.  *Id.* (quoting *Bordanaro v. McLeod*, 871 F.2d 1151, 1157 (1st Cir. 1989)).  In *Bordanaro*, the Court held that although there was no direct evidence that the Chief of Police had actual knowledge of the policy of breaking down doors without a warrant, the evidence did support a finding of his constructive knowledge. *Id.* at 1157.  The evidence in that case showed that he oversaw the operations of the entire department and set much of its policy, and that he utilized an extensive report review process to monitor the conduct of his officers and to ensure that they complied with the rules of the department. *Id.* According to the Court, that process would alert the Chief to practices that "transgressed department policy."  *Id.*  Therefore, knowledge of the practice was imputed to the Chief.  *Id.*  According to Plaintiff, Sheriff Tillman knew of widespread problems at the Mobile County Metro Jail, and he failed to do anything to correct them.  (Doc. 461, p. 3.)

In order to prove that Sheriff Tillman should have known that he needed to correct a systemic problem at the Mobile County Metro Jail, Plaintiff turns the Court's attention to the death of inmate James Carpenter.  An investigation report was filed on July 23, 2001, regarding the death of Mobile County Metro Jail inmate James Carpenter by Mobile County Sheriff's Department Sergeant Dru Ryals.   Carpenter died after being allowed to lie in a pool of his own urine and feces for days while shackled at the hands and feet.  The report states: "Rhoda Manning, [Juzang] RN, Director of Nursing, Metro Jail . . . has attempted to supervise everyone under her command, but her efforts have been thwarted by Deputy Warden Owens and the previous warden, Rick Gaston."  The report further states: "During the time of Carpenter's incarceration and death, Chief Tim Barbour was the Chief Deputy for Detention and was responsible for the operation of the Metro Jail.  [Standard Operating Procedures were][19] violated and

---

[19]Mobile County Metro Jail Standard Operating Procedure No. 1.1.9, 1A-16 states: "Channel of Communication . . . Written policy, procedure, and practice provide for regular meetings between the facility administrator and all department heads and their key staff members.  Such meetings are to be conducted at least monthly.  There is formal documentation that the meetings are held at least monthly."

there is no evidence that he took any active role in assuring the jail functioned within established guidelines."

Plaintiff offers that Sgt. Ryals' report provided Sheriff Tillman with notice of several problems at the Jail during Carpenter's fifteen day incarceration.  (Doc. 461, pp. 6-9.)  She claims that the defendants in this case have not articulated a single step that was taken in response to the July 23, 2001, Carpenter report, which was released a little more than a month after Battiste's incarceration began.  *Id.* at 9.  Furthermore, Plaintiff cites to Dr. Gottula's deposition, where he testified that the Jail was guilty of "serious neglect" because it did not have a psychiatrist on staff for approximately seven months.  *Id.* at 11.  Ms. Watkins also quotes a letter from Dr. Gottula, which states, "In fact, the [Jail] appears to have stopped following many of the Policies and Procedures that they had put into place in order to maintain a functional health care system."  (Pl.'s Exhibit 58, p. 10.)

Plaintiff has not provided any evidence which suggests that while in custody at the Mobile County Metro Jail Battiste was not taken to every appointment he had with a physician or that he was not provided with the

specialty care that his serious medical needs required.  Moreover, Plaintiff admitted that she has no evidence that Battiste did not receive his medications while he was in the Mobile County Metro Jail.  The undisputed facts demonstrate that the staff at the  Jail was not deliberately indifferent to Battiste's medical needs.  *See, e.g., Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989) ("[W]hen a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation.").  Furthermore, Plaintiff's reliance on the Carpenter report to prove that there is a "widespread and systemic problem" at the Mobile County Metro Jail is misplaced.[20]  Inmate Carpenter's death, and the circumstances surrounding

---

[20]The Court has for consideration Sheriff Tillman's Motion for Sanctions (Doc. 410), filed contemporaneously with his motion for summary judgment.  Sheriff Tillman asks this Court to sanction Plaintiff by preventing her from coming forward, in the future, with facts to support her claims of deliberate indifference against him.  Sheriff Tillman bases his argument on the assertion that Plaintiff has failed to appropriately supplement her responses to his interrogatories as directed by the Court.  Plaintiff responds by asserting, "Defendant Tillman has all of the information Plaintiff has discovered, and Plaintiff has appropriately identified the same in her discovery responses."  (Doc. 471, p. 1.)  Plaintiff has also identified the fact that she objected to Sheriff Tillman's interrogatories based upon her assertion that she was missing crucial sections and pages of records provided by the Sheriff, as well as her assertion that to fully answer some of Tillman's interrogatories would reveal information related to Plaintiff's counsel's thoughts, impressions, strategies, and detailed plans regarding his arguments at trial.  *Id.* at 4.   The Court recognizes that Plaintiff's responses to Sheriff Tillman's interrogatories are not as descriptive as Sheriff Tillman would like.  However, Plaintiff has indicated that she will not introduce facts and evidence at trial which have not already been disclosed to Sheriff Tillman.  Therefore, Sheriff Tillman's motion is due to

his death, do not provide evidence of "deprivations that constitute

widespread abuse sufficient to notify the supervising official" because it

does not show incidents which are "obvious, flagrant, rampant and of

continued duration, rather than isolated occurrences." *Hartley v. Parnell*,

193 F.3d 1263, 1269 (11th Cir. 1999).  Also, the Court sees no similarities

between the conditions of Carpenter's confinement and Battiste's

incarceration.  Unlike Carpenter, the evidence reveals that Battiste received

appropriate and timely medical care.  As Sheriff Tillman correctly points

out, Plaintiff's assertion that the Jail staff failed to hold quarterly or

monthly meetings and quality assurance meetings misses the mark because

she has failed to establish the requisite causal connection between the

---

be granted to the extent Plaintiff is prevented from introducing facts and evidence
which have not previously been disclosed.

In his reply, Sheriff Tillman also clarifies that he wants the Carpenter report
stricken from the record due to the fact that Plaintiff did not disclose that she intended
to rely upon it in this case.  (Doc. 490.)  He asserts that had he known that Plaintiff
intended to use the Report, he would have developed a record to demonstrate that many
of the conclusions reached in it are without merit.  The Court recognizes that the
Carpenter Report contains conclusory allegations regarding the circumstances
surrounding inmate Carpenter's death.  Because the Court agrees with Sheriff Tillman
that the Report does not establish a widespread, systemic problem at the Mobile Metro
Jail, he has not been prejudiced by Plaintiff's introduction of the Report.  Sheriff
Tillman's motion is due to be denied to the extent it seeks to strike the Carpenter
Report from the record.

For these reasons, Sheriff Tillman's Motion for Sanctions is due to be GRANTED IN
PART and DENIED IN PART.

alleged failure to hold meetings and the claims made on behalf of Battiste. (Doc.489, p. 9.)

(b)    Qualified Immunity.

Sheriff Tillman also argues that he is entitled to qualified immunity in this case because his actions were not so obviously wrong that they can be characterized as deliberately indifferent.  (Doc. 412, p. 14.)    The first step in analyzing any case asserting the defense of qualified immunity "is to determine . . . whether the plaintiff has alleged a deprivation of a constitutional right." *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n. 5 (1998).  Plaintiff asserts that Battiste's Eighth Amendment rights were violated because Sheriff Tillman failed to correct "systemic problems" at the Mobile County Metro Jail.  As discussed more fully in the preceding sections, this Court holds that Sheriff Tillman is entitled to summary judgment as to Plaintiff's § 1983 claims.  However, even if there was a violation of Battiste's Constitutional or statutory rights, Sheriff Tillman contends that the doctrine of qualified immunity shields him from any potential liability.  The seminal case regarding qualified immunity is *Harlow v. Fitzgerald,* 457 U.S. 800 (1982), which held that "government officials

performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate 'clearly established' statutory or constitutional rights of which a reasonable person would have known."  *Id.* at 818; *see also Lee v. Ferraro*, 284 F.3d 1188, 1193-94 (11th Cir. 2002); *Maggio v. Sipple*, 211 F.3d 1346, 1350 (11th Cir. 2000).  The purpose of qualified immunity is to "ensure that before they are subjected to suit, officers are on notice their conduct is unlawful."  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Saucier v. Katz*, 535 U.S. 194, 206 (2001)).

Sheriff Tillman was clearly a government official.  Therefore, to determine whether he is entitled to qualified immunity, the Court must make a two-step inquiry.  *See, e.g., Maggio*, 211 F.3d at 1350.  First, the Court is to consider whether "the defendant government official [has proved] that he was acting within the scope of his discretionary authority when the alleged wrongful act occurred."  *Id.* (internal quotations omitted). There does not appear to be any dispute regarding this issue.

Since it appears that he was acting within his authority, the Court must turn to "whether [Plaintiff] has demonstrated that [Sheriff Tillman]

'violated clearly established law.'"  *Id.* (quoting *Gonzales*, 161 F.3d at 1295).  The burden is on Plaintiff to demonstrate that Tillman:

> had fair notice that [his] conduct was unlawful . . . judged against the backdrop of the law at the time of the conduct.  If the law at that time did not clearly establish that [his] conduct would violate the Constitution, [Sheriff Tillman] should not be subject to liability or, indeed, even the burdens of litigation.

*Brosseau v. Haugen*, 543 U.S. at 198.  The Court's inquiry "must be undertaken in light of the specific context of the case, not as a broad proposition."  *Id.* at 198-99 (quoting *Saucier v. Katz*, 533 U.S. at 201).  Furthermore, the question of whether a defendant is entitled to qualified immunity must be decided with reference only to undisputed facts and in isolation from the remaining issues of the case.  *See Sheth v. Webster*, 145 F.3d 1231, 1236 (11th Cir. 1998) (quoting *Johnson v. Jones*, 515 U.S. 304, 313 (1995)).

   In this case, Sheriff Tillman is entitled to qualified immunity because Plaintiff has not provided evidence that he was deliberately indifferent to Battiste's serious medical needs.  She has not established the subjective component of the deliberate indifference analysis.  Plaintiff has also failed

to point to any policies or customs of the Jail which are causally connected to Battiste's death.  There is simply no evidence that Sheriff Tillman acted in violation of clearly established law.  Therefore, he is entitled to the shield of qualified immunity.

(c)   Plaintiff's Motion for an Adverse Inference/Presumption.

Along with her response to Sheriff Tillman's Motion for Summary Judgment, Plaintiff has also filed a Motion for an Adverse Inference/Presumption, or in the alterative, a Motion for Sanctions Against Defendant Jack Tillman.[21]  (Doc. 481.)  Ms. Watkins alleges that Sheriff Tillman destroyed evidence which is integral to the "pursuit and prosecution of [her] claims against him."  *Id*.  Plaintiff offers that at the first status conference she agreed to voluntarily produce Battiste's medical records in exchange for the medical records in the possession of the defendants. According to Plaintiff, she received Battiste's medical files from all of the

---

[21]Plaintiff has filed what she entitled a Memorandum in Support of her Motion for an Adverse Inference/Presumption (Doc. 481), but it does not appear that she ever actually filed a Motion for an Adverse Inference/Presumption.  However, for electronic court filing and docketing purposes, the Court will treat Plaintiff's memorandum as a motion.

defendants except Sheriff Tillman.   She alleges that Sheriff TIllman admitted that the records were lost, but he refused to state the same in response to her requests for discovery.  *Id.* at 3.  Plaintiff concedes that Battiste was taken to his medical appointments outside the Jail and that those records have been produced by other healthcare providers, but she contends that there is no evidence to show when, how, or why medication either was or was not administered to Battiste at the Jail.  *Id.* at 4-5.  She submits to the Court that if Battiste's medical records from the Mobile County Metro Jail were available, they may help her prove her case of deliberate indifference.   *Id.* at 7.   As evidence that Sheriff Tillman intentionally destroyed Battiste's medical file, Plaintiff references the fact that he was indicted for lying under oath and ethics violations related to his alleged misappropriation of Mobile Metro Jail funds that had been earmarked for inmate food.  *Id.* at 3.

In the Eleventh Circuit, "an adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith."  *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997).  *See also Penalty Kick Management, Ltd. v. Coca Cola Company*, 318

F.3d 1284, 1293-94 (11th Cir. 2003).  Plaintiff relies on the district court's holding in *Stanton v. National R.R. Passenger Corp.*, 849 F. Supp. 1524 (M.D. Ala. 1994), to support her motion for an adverse inference.  In *Stanton*, the fact issue in the case was the speed of a train that struck a truck at a railroad crossing.  During discovery, it was determined that the train's speed tape was either lost or destroyed by the defendants, and Plaintiff alleged that the loss or destruction was intentional.  In opposition to the defendant's motion for summary judgment, the plaintiff requested an "adverse inference to be drawn from the destruction of [the] evidence . . . that the train was traveling in excess of the speed limit at the time of the collision." *Stanton*, 849 F. Supp. at 1528.  The district court distinguished its case from a Fifth Circuit ruling that required a finding of bad faith on the part of the spoliator in order to draw an adverse inference.  *Id.* (citing *Vick v. Texas Employment Comm'n*, 514 F.2d 734, 737 (5th Cir. 1975)).  In *Vick*, the records were destroyed prior to trial pursuant to the defendant commission's regulations governing the disposal of inactive records.  *Id.* However, in *Stanton*, the district court noted that there was a genuine issue of material fact as to the motivation behind the defendant's actions.  The

defendants offered testimony regarding possible reasons for the loss of the speed tape, and they established that is was Amtrak's procedure to save the tape after an accident. *Id.* However, because the defendants could not explain the circumstances surrounding the disappearance of the tape and because the court found that there was a genuine issue of material fact regarding the motivations behind the defendant's conduct, the court gave the plaintiff the benefit of the adverse inference to be drawn from the missing tape, i.e., that the train was traveling in excess of the speed limit. *Id.* Plaintiff argues that this case is similarly distinguishable from *Vick* and *Bashir* because Sheriff Tillman has offered no explanation for the missing medical records and there is a genuine issue of material fact regarding his motivation for destroying Battiste's medical file. (Doc. 481, p. 9.) Moreover, Plaintiff offers that it was the policy of the Mobile County Metro Jail to maintain medical files "indefinitely," and Alabama law requires their retention for seven years.

Sheriff Tillman responds by asserting that the loss of some of Battiste's medical records occurred prior to suit being filed. (Doc. 492, p. 2.) He claims that immediately after suit was filed, a thorough search was

commenced which lasted for several months and included a box by box, page by page search for anything that included the name Russell Battiste. He also denies that there is any evidence of bad faith.  As Sheriff Tillman points out, the Eleventh Circuit distinguished the facts of *Bashir* from the district court's ruling in *Stanton*.  In *Stanton*, the train's engineer testified that at the time of the accident, the train was traveling only one mile per hour below the speed limit; however, in *Bashir*, there were two witnesses who testified that the train was traveling ten miles per hour below the limit. *Bashir*, 119 F.3d at 932-33.  The Court also noted in *Bashir* that there was no evidence that the Amtrak employees had any motive or opportunity to tamper with the speed tape.  *Id.* at 933.  In this case, Sheriff Tillman has consistently represented to Plaintiff that Battiste's medical records have been lost.  There is no evidence that Sheriff Tillman has been in possession of the records at any time since the filing of Plaintiff's Complaint on December 27, 2004.  (Doc. 1.)  In fact, he has asserted that he was not even aware of Russell Coleman Battiste until Ms. Watkins filed the instant case.

Sheriff Tillman also asserts that there are adequate records from the Mobile County Metro Jail and the Mobile County Health Department to

indicate that Battiste received his medications while he was incarcerated. (Doc. 492, p. 8-25.)  Furthermore, the witness testimony currently on the record evidences that Battiste received his medications.  The Jail has offered evidence which shows that it filled $48,000.00 worth of prescriptions for Battiste, and the testimony of both corrections officers and nurses indicate that Battiste, as well as other inmates, received their medications. Dr. Ramsey's notes indicate that Battiste was compliant with his prescriptions, and there is no evidence that Battiste ever told Dr. Ramsey that he was not receiving his medications at the Jail.  Finally, Ms. Watkins has testified that she tried to visit her brother at the Mobile County Metro Jail at least once per week, and she has no recollection of Battiste ever telling her that he was not receiving his medications.  Like *Bashir*, where two witnesses testified that the train was traveling well below the speed limit despite the destruction of the speed tape, there is a plethora of evidence in this case to rebut Plaintiff's assertion that Battiste did not receive his medications at the Jail.

The case sub judice is readily distinguishable from *Stanton* and Plaintiff has not offered evidence of bad faith on the part of Sheriff Tillman. Therefore, Plaintiff's motion for an adverse inference is due to be denied.

For these reasons, no genuine issues of fact remain as to Plaintiff's remaining claims against Sheriff Tillman in his individual capacity, and Sheriff Tillman is entitled to summary judgment.

(2)   Mobile County.

Plaintiff appears to have abandoned her claims against Mobile County for deliberate indifference.  In her First Amended Complaint, Ms. Watkins asserts seven separate claims against the defendants, including Mobile County.  (Doc. 210.)  However, in the Joint Status Report, Plaintiff only describes four separate state law claims against Mobile County, and in her response to the County's motion for summary judgment she asserts that her "claims against Mobile County arise from the breach of its contractual duty to provide for the 'care and safekeeping of City detainees' detained by the City at the Mobile Metro Jail . . . ."  (Docs. 401, pp. 14-18; 461, p. 16.) Failure to respond to an opposing party's argument regarding a claim constitutes an abandonment of that claim and warrants dismissal of the

claims of the opposing party.  *See Bute*, 998 F. Supp. at 1477.  Moreover,

issues and contentions not raised in a parties' brief are deemed abandoned.

*See, e.g., Avocent Huntsville Corp.*, 443 F. Supp. 2d at 1329 n. 172.

Therefore, this Court treats Plaintiff's § 1983 claims against Mobile County

as abandoned, and the County is entitled to summary judgment as to those

claims.

Even if Plaintiff had not abandoned her § 1983 claims against Mobile

County, the County would have been entitled to summary judgment as to

those claims.  Supreme Court and Eleventh Circuit case law clearly states

that an Alabama sheriff is a State official and does not operate as a county

official for determining liability under both federal and state law. *See, e.g.,*

*McMillian v. Monroe County*, 520 U.S. 781, 793 (1997) ("Alabama sheriffs,

when executing their law enforcement duties, represent the State of

Alabama, not their counties."); *Turquitt v. Jefferson County, Alabama*, 137

F.3d 1285, 1288 (11th Cir. 1998) ("An Alabama sheriff acts exclusively for

the state rather than for the county in operating a county jail.").  In

*Turquitt*, the Court held that "Alabama's Constitution sends a clear message

that a sheriff is a state officer, whose actions with respect to the well-being

of jail inmates are most appropriately controlled by state officials" and that "Alabama sheriffs act as state officers when supervising inmates and otherwise operating the county jails." *Turquitt*, 137 F.3d at 1289. The duties of an Alabama county with regard to jails "are limited to funding the operation of the jail." *Id.* For these reasons, the Court is persuaded that the Sheriff of Mobile County and not Mobile County itself is the proper party defendant for Plaintiff's § 1983 claims for alleged violations of Battiste's rights that occurred at the Mobile Metro Jail.[22]

### (3)   City of Mobile.[23]

Plaintiff alleges that the City owed "non-delegable duties to Mr. Battiste under, among other authorities, the Fourteenth and Eighth Amendments to the U.S. Constitution." (Doc. 461, p. 15.) According to Ms.

---

[22]Defendant Mobile County also asserts in its brief that in the event Plaintiff intended to name the individual Mobile County Commissioners as defendants in this case, they are entitled to legislative immunity. (Doc. 428, p. 14.) However, this Court sees no intention on the part of Plaintiff to assert claims against the individual commissioners.

[23]Plaintiff also asserts state law claims against the City of Mobile for negligent training and supervision resulting in wrongful death. (Doc. 401, p. 9.) The City argued that it was entitled to summary judgment as to those claims in its brief, but Plaintiff failed to respond to those arguments. Therefore, the Court treats Plaintiff's state law claims against the City of Mobile as abandoned, and it is entitled to summary judgment as to those claims. *See, e.g., Avocent Huntsville Corp.*, 443 F. Supp. 2d at 1329 n. 172; *Bute*, 998 F. Supp. at 1477.

Watkins, "The City cannot pass its duties off to another person or entity, and simply because Mr. Battiste was arraigned on violations of state law, opposed to municipal ordinances, does not extinguish the non-delegable constitutional duties that arose the moment City of Mobile police officers arrested Mr. Battiste." *Id.* The City of Mobile asserts that it was not deliberately indifferent to Battiste's serious medical needs. (Doc. 423, p. 4.) In fact, it claims that it had no actual knowledge of Battiste's condition and was not on notice that his needs were not being met. *Id.* The City also asserts that it had no duty to provide medical treatment to Battiste because he was not held at the Jail pursuant to the City's custody. *Id.* at 4-5. According to the City, Battiste was charged with violations of State law, not municipal ordinances, and was housed at the Mobile Metro Jail pursuant to orders of the District Court of Mobile County and Circuit Court of Mobile County. *Id.* at 5.

On June 18, 2001, Battiste had a bond hearing in front of Judge Charles McKnight, a District Judge for the District of Mobile County, Alabama. Battiste was unable to make bond, and on July 21, 2001, he had a preliminary hearing before Judge McKnight who bound him over to the

Mobile County Grand Jury.  The Grand Jury indicted Battiste in September 2001 on two charges of attempted murder, and he was later arraigned before Circuit Judge Ferrill McRae on October 18, 2001.  The City argues that from at least June 2001, Battiste was held at the Jail not on the authority of the City, but on charges that he violated State criminal law and was held under the authority of the State of Alabama.  (Doc. 423, p. 8.)  While it is undisputed that Battiste was arrested by City police officers, the City argues that he was not held at the Jail pursuant to the City of Mobile.

The City argues that "[t]here is a total absence of any evidence in the records which would support a finding that City of Mobile Defendants possessed subjective knowledge that Battiste had a medical condition that placed him at subjective harm."  (Doc. 423, p. 12.)  Even if Plaintiff could show the City had actual knowledge of Battiste's condition, the City is not vested with the care of inmates incarcerated at the Mobile County Metro Jail.  As discussed in the preceding sections, the Jail is under the control and authority of the Sheriff of Mobile County.  *See* Ala. Code § 14-6-1; *Turquitt*, 137 F.3d at 1289.  Under Alabama law, the City of Mobile has no

obligation to provide care to inmates incarcerated in a facility that is under the control of the Mobile County Sheriff.

Despite Plaintiff's blanket assertions that the City owed a duty to Battiste after he was placed in the custody of the Mobile County Metro Jail, which is under the control and authority of the Sheriff of Mobile County, she has not offered any case law or statutory authority to support her claims. She has also failed to offer any evidence to show that the City knew of conduct at the Mobile County Metro Jail which was deliberately indifferent to Battiste's serious medical needs.  Plaintiff has failed to establish that there remains a genuine issue of material fact regarding her deliberate indifference claims against the City of Mobile.  Therefore, the City is entitled to summary judgment as to Plaintiff's claims against it.

(4)    Individual City Defendants Dow, Cashdollar, and Cochran.

Defendants Samuel Cochran, Chief of Police for the City of Mobile; Michael C. Dow, Mayor of the City of Mobile; and Richard Cashdollar, Executive Director for Public Safety for the City of Mobile, have moved for summary judgment as to Plaintiff's claims against them.  (Doc. 422.)  In

addition to adopting the same arguments made by the City, these individual defendants each claim that they are entitled to the shield of qualified immunity for any claims under § 1983 and that the statute of limitations for such claims against them has expired.  (Doc. 423, p. 18.)

Plaintiff has failed to respond to any of the arguments raised by Cochran, Dow, and Cashdollar.  No response brief was ever filed in response to their motion for summary judgment.  In response to their qualified immunity arguments, Plaintiff has not disputed that any action allegedly taken was done pursuant to the performance of their duties or within the scope of their authority as officers and employees of the City of Mobile. Since it is established that they were acting within their discretionary authority, the burden shifted to Plaintiff to show that qualified immunity did not apply.  *See, e.,g., Vineyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002).   Plaintiff has not offered any arguments or citation to authority which would show that these defendants were on notice that their actions violated clearly established constitutional rights.   Moreover, failure to respond to an opposing party's arguments regarding a claim constitutes an

abandonment of that claim.  *See, e.g., Avocent Huntsville Corp.*, 443 F. Supp. 2d at 1329 n. 172; *Bute*, 998 F. Supp. at 1477.

For these reasons, defendants Cochran, Cashdollar, and Dow are entitled to summary judgment as to Plaintiff's claims against them.

(5)   Mike Haley.

(a)   Deliberate Indifference.

Mike Haley was the Commissioner of the Alabama Department of Corrections at all times pertinent to this civil action.  It is undisputed that he did not know Battiste nor did he have any knowledge of Battiste's illness or of the medical treatment he received.  At no time did anyone ever provide information to Haley regarding Battiste, his illness, or any possible problems with his medical treatment.  However, defendant Ronald Cavanaugh testified that he informed Mike Haley via voice and memorandum on or about November 15, 2002, of the problems with medical care for inmates infected with AIDS after Moore and Associates conducted an audit of the medical clinic at Limestone.  The audit provides in pertinent part:

> Directing medical care [at Limestone] is Dr. Simon, the site medical director.  Dr. Simon is very well qualified to fill this position.  She is trained in infectious diseases and

brings previous hospital and correctional experience.  Her initial correctional experience occurred at Rikers Island in New York, a location with many complex HIV cases and a high prevalence of TB and other infectious diseases.

Dr. Simon's experience and qualifications were readily apparent in the review of her charts.  Her documentation is exceptional and skill as a practitioner is apparent in promptly and decisively addressing medical problems as they are presented.  Most of the patients in the charts reviewed are responding with optimal levels of viral suppression.  Those with poor response all have completed resistance testing and the regimens have been adjusted to correspond with the test results.  All patients who meet the DHHS guidelines for antiretroviral therapy are either receiving medication or have been offered treatment.

(Haley Exhibit CC, p. 4.)

Haley argues that there is no evidence that he either exhibited deliberate indifference towards Battiste's medical needs by means of interfering with the prison health care personnel's performance or in any other manner which would satisfy the standard set forth in *Estelle*, *supra*. (Doc. 426, p. 14.)  Haley cites to the Fourth Circuit case of *Miltier v. Beorn*, 896 F.2d 848 (4th Cir. 1990), for the proposition that supervisory officials, such as himself, are entitled to rely on the medical judgments made by prison physicians and health care personnel.  *Id*. at 854-55.  (Doc. 426, p.

14.)  Haley also argues that he cannot be held liable as a supervisor because the medical personnel at Limestone were employees of Naphcare and not the Alabama Department of Corrections.  *Id*. at 17.  According to Haley, Plaintiff's only evidence to support her claims against him is that on November 15, 2002, he was provided with a copy of the Moore and Associates audit which praised Dr. Simon and her professional treatment of inmates with AIDS.  *Id*. at 18.   Neither the memorandum from Ronald Cavanaugh nor the audit say anything about Russell Battiste.  *Id*.

Plaintiff admits "that these Defendants may not have had specific and actual knowledge of Mr. Battiste's serious medical condition," but she contends that "they all knew that chronically ill HIV positive inmates were being housed at Limestone and treated by Naphcare."  (Doc. 462, p. 4.) Additionally, Plaintiff states, "they were all aware of specific complaints with regard to the healthcare being provided by Naphcare yet simply chose to do nothing about it."  *Id*.   Ronald Cavanaugh testified that inmate complaints regarding healthcare services provided by Naphcare at the Limestone Prison doubled, if not more, during the summer of 2002.  (Pl.'s Exhibit 65, p. 171.)   Based upon the number of complaints, Cavanaugh

decided to hire outside contractors to institute a more formal oversight of Naphcare.  *Id.* at 174-75.  Moore and Associates was hired to perform the audit, which Plaintiff opines eventually led to the termination of Naphcare's contract with ADOC.  (Doc. 462, p. 5.)  Plaintiff cites to the audit, which notes several perceived shortcomings in the treatment of individuals with HIV at the Limestone facility.  Plaintiff claims that direct complaints regarding the unavailability of HIV medications and antibiotics were made to Wardens Mitchem and Wise, as well as Haley.  *Id.* at 8.  Ms. Watkins has also provided the Court with approximately eighty-nine pages of complaints made by Limestone prisoners regarding the unavailability of medication from 2001 through 2003.  (Pl.'s Exhibit 56.)  Some of the complaints were made directly to defendants Haley, Mitchem, and Wise.  Plaintiff offers that defendants Haley, Cavanaugh, Mitchem, and Wise chose "to do nothing," which "was in complete disregard of the harm it would cause to the inmates who require adequate and proper healthcare for their HIV in order to stay alive." (Doc. 462, pp. 8-9.)  Plaintiff alleges that she has provided reliable evidence and expert testimony to show that the deliberately indifferent actions of defendants Haley, Cavanaugh, Mitchem, and Wise allowed

defendants Naphcare, Simon, Smith, Jones, and Barnes to continue to provide deliberately indifferent healthcare to Battiste which caused his death. *Id*. at 9.

Even if Haley was on notice as to some problems with Naphcare's care of inmates at Limestone, there is no evidence that he was aware of any risk of harm to Battiste and then acted with deliberate indifference towards such risk. *See McElligot*, 182 F.3d at 1254-55.  In fact, the Moore and Associates audit applauded Dr. Simon, Battiste's treating physician at Limestone.

(b)   Qualified Immunity.

Haley also argues that even if he is not entitled to summary judgment as to Plaintiff's claims under § 1983, he is entitled to the defense of qualified immunity.  (Doc. 426, p. 18.)  There does not appear to be any dispute regarding Haley's assertion that at all times relevant to this action he was acting within his discretionary authority as the Commissioner of the Alabama Department of Corrections.  Moreover, even if all of Plaintiff's assertions are true, she has not pointed to any specific act or omission on the part of Haley, as the Commissioner of ADOC, which violated clearly

established law.  Therefore, Haley is entitled to qualified immunity as to

Plaintiff's § 1983 claims against him.

> (6)    Defendants Mitchem, Cavanaugh, and Wise.[24]

> (a)    Deliberate Indifference.

Defendants Billy Mitchem, Warden of Limestone Prison; Ronald

Cavanaugh, Director of Treatment for ADOC; and David Wise, Deputy

Warden at Limestone, contend that they are entitled to summary judgment

as to Plaintiff's § 1983 claims against them and that they are entitled to the

defense of qualified immunity for their alleged acts/omissions.  (Doc. 404,

pp. 6-8.)  These defendants argue that Ms. Watkins' only proof to support

her claims is that they knew that Battiste was an HIV patient at Limestone.

*Id*. at 17.   They offer that "[t]here is no evidence that any of these

defendants were aware of the intricacies of the treatment of HIV patients

and the prevention of its opportunistic infections."  *Id*.  They claim that

---

[24]Plaintiff also asserts state law claims against defendants Cavanaugh, Mitchem, and Wise.  (Doc. 210.)  The defendants argued that they are entitled to summary judgment as to those claims in their brief, but Plaintiff failed to respond to those arguments.  Plaintiff also failed to include such claims in her statement in the Joint Status Report.  (Doc. 401, pp. 34-35.)  Therefore, the Court treats Plaintiff's state law claims against these defendants as abandoned, and they are entitled to summary judgment as to those claims.  *See, e.g., Avocent Huntsville Corp.*, 443 F. Supp. 2d at 1329 n. 172; *Bute,* 998 F. Supp. at 1477.

they reasonably relied on the medical provider, Naphcare, to provide daily treatment for Battiste as an HIV patient.  *Id*.

Plaintiff seems to be making a "more should have been done" argument, which has been explicitly rejected by the Supreme Court in *Estelle v. Gamble*, 429 U.S. at 107.  The defendants argue that while there is no dispute that they knew about Battiste's HIV, Plaintiff has not differentiated between such knowledge and her burden of showing that they knew that he "was wasting away because of it."  (Doc. 404, p. 18.)  They assert that there is no evidence that they were aware of any of the medical decisions of the medical staff or the condition and eventual death that resulted.  *Id*. at 19.  The evidence indicates that defendants Mitchem and Wise relied on the medical treatment provided by Dr. Simon and her staff. They offer that Plaintiff has provided no evidence that they personally witnessed any care, negligent or otherwise, given to Battiste.  (Doc. 483, p. 4.)  A warden and deputy warden would not be responsible for reviewing the medical charts of an inmate.  Their reliance on the Naphcare staff to provide medical treatment to Battiste is not evidence of deliberate indifference.  Ms. Watkins has provided no evidence to show that these

defendants were subjectively aware of a substantial risk of harm to Battiste and then acted with deliberate indifference towards that risk. *See, e.g., McElligot*, 182 F.3d at 1254-55. If anything, the facts of this case indicate that the correctional staff at Limestone provided Battiste with medical care during his incarceration. In fact, whenever the Naphcare staff felt that it was warranted that Battiste needed additional medical care that could not be provided at Limestone, he was transferred to Huntsville Hospital. It appears that the Limestone staff (not the Naphcare staff) provided Battiste with what appeared to be proper and medical care. There is no evidence that they actually knew of "an excessive risk to [Battiste's] health or safety" and disregarded that risk. *Campbell*, 169 F.3d at 1364.

(b)    Qualified Immunity.

Defendants Cavanaugh, Mitchem, and Wise also argue that they are entitled to the protection of qualified immunity. There does not appear to be any dispute regarding the fact that these defendants were acting within their discretionary authority at all times relevant to this action. Therefore, the burden shifts to Plaintiff to show that their acts/omissions violated clearly established law. Plaintiff has not provided evidence that these

defendants had fair notice that any of their alleged conduct was unlawful. *See Brosseau*, 543 U.S. at 198.  There is no evidence that they had actual notice that Battiste was not receiving his medications or not receiving appropriate care and treatment for his serious medical needs.  Therefore, defendants Mitchem, Cavanaugh, and Wise are entitled to qualified immunity.

(7)   Naphcare Defendants.

(a)   Dr. Simon.

Plaintiff asserts claims against Dr. Simon under § 1983 for both her own alleged acts of deliberate indifference as well as for her supervisory liability.[25]  (Doc. 401, pp. 24-29.)  The Supreme Court has held that "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment

---

[25]Even though Plaintiff lists supervisory liability under § 1983 as a claim against Dr. Simon in her statement of claims in the Joint Status Report (Doc. 401, p. 28), and Dr. Simon argues that she is entitled to summary judgment as to that claim in her brief in support of her motion for summary judgment, Plaintiff fails to respond to Dr. Simon's argument.  Moreover, Plaintiff has failed to offer any evidence to support her contention that Dr. Simon was responsible for the training and supervision of the staff at Limestone. Therefore, the Court treats Plaintiff's claim for supervisory liability against Dr. Simon as abandoned, and she is entitled to summary judgment as to those claims.  *See, e.g., Avocent Huntsville Corp.*, 443 F. Supp. 2d at 1329 n. 172; *Bute*, 998 F. Supp. at 1477.

under the Eighth Amendment." *Estelle*, 429 U.S. at 106.  Liability may only

be imposed on Dr. Simon for deliberate indifference if Ms. Watkins proves

that she actually knew of "an excessive risk to [Battiste's] health or safety"

and disregarded that risk.  *Campbell*, 169 F.3d at 1364 (quoting *Farmer*, 511

U.S. at 837); *see also Lancaster*, 116 F.3d at 1425 ("[A]n official acts with

deliberate indifference when he knows that an inmate is in serious need of

medical care, but he fails or refuses to obtain medical treatment for the

inmate."); *Hill*, 40 F.3d at 1186 ("[K]nowledge of the need for medical care

and intentional refusal to provide that care constitute[s] deliberate

indifference."); *Ancata*, 769 F.2d at 704 ("[K]nowledge of the need for

medical care and the intentional refusal to provide that care has

consistently been held to surpass negligence and constitutes deliberate

indifference.").   Plaintiff must demonstrate that Dr. Simon had a

"sufficiently culpable state of mind."  *Id.*

There does not appear to be any dispute that Battiste suffered from

a serious medical need, and it would follow that as his treating physician,

Dr. Simon would have knowledge of his condition, as well as the risk of harm

that accompanied it.  In fact, Dr. Simon documented that Battiste suffered

from PCP, and she indicated on his death certificate that PCP was a cause of his death.

Dr. Simon argues that the evidence shows that she timely responded to Battiste's requests for medical examinations and that she did not disregard his risk of infection.  (Doc. 439, p. 26.)  There is no indication that Dr. Simon refused to examine Battiste or either refused or delayed treatment to Battiste which she thought he needed.  The evidence does not reveal any instance in which Dr. Simon prevented Battiste from accessing competent medical personnel.  While this Court is of the opinion that Plaintiff has met her burden of providing evidence of causation under AMLA, as stated above, Plaintiff has not presented evidence that Dr. Simon, or any other member of the medical staff at Limestone, was incompetent to treat Battiste.  Dr. Wohl, Plaintiff's expert, could not testify with any degree of certainty regarding any criticisms of Dr. Simon's competency in treating Battiste.  (*See, e.g.,* Naphcare Def.'s Exhibit I, pp. 125-27.)

Realizing that she cannot rely on a "more should have been done" argument with regard to a § 1983 claim, Plaintiff argues that "the record reveals that during the last month of Mr. Battiste's life, Defendant Simon

DID NOT DO ANYTHING." (Doc. 469, p. 28.) She points to Dr. Simon's note that Battiste died of PCP, yet she did not prescribe any PCP therapy or treatment for him during his last month of life. *Id.* The evidence indicates that Dr. Simon examined Battiste at least forty-five times within his six months of incarceration at Limestone. (Naphcare Def.'s Exhibit G, pp. 164-89.) The simple fact that Dr. Wohl disagrees with Dr. Simon's course of treatment may form the basis for a claim of medical malpractice, but it does not support a showing that Dr. Simon acted in a manner that was deliberately indifferent to Battiste's serious medical needs. Plaintiff has not provided any evidence of the element of "intent" on the part of Dr. Simon. She has not even attempted to show the sort of punitive mental element required in order to establish a claim for deliberate indifference. *See Wilson*, 501 U.S. at 242-49. Therefore, Dr. Simon is entitled to summary judgment as to Plaintiff's § 1983 claims for deliberate indifference.

(b)     Nurses Smith, Jones, and Barnes.

Plaintiff alleges that LPNs Smith, Jones, and Barnes were deliberately indifferent to Battiste's serious medical needs in violation of § 1983. (Doc.

401, p. 29.)[26]  She provides the affidavit of inmate Eric Lamar Howard, who states that in response to Battiste's pleas for help while in the infirmary, Defendant Smith removed the call button from his room so she would not have to hear him call for help.  (Pl.'s Exhibit 48, Howard Affid., p. 3.)  Mr. Howard's statement is supported by Naphcare's own records which indicate that Limestone administrative staff scolded the Naphcare nursing personnel and Naphcare for this act.  (Pl.'s Exhibit 41.)  Plaintiff offers that removal of Battiste's call button could have prevented him from receiving potentially life-saving medications.  (Doc. 456, p. 21.)  Mr. Howard also declared in his affidavit that LPNs Smith and Barnes would often say that they did not want to feed or bathe Battiste because he was HIV positive.  (Pl.'s Exhibit 48, Howard Affid., p. 2.)  Plaintiff also offers the affidavit of Joseph Brown who attests to the fact that LPNs Smith and Barnes told him that if Battiste could not walk to the pill call window then they would not give him his medication.  (Pl.'s Exhibit 49, Brown Affid., p. 2.)  He also stated that the

---

[26]In her response brief, Plaintiff states, "having recently been provided an opportunity to compare many of the indecipherable medical records with the scheduling duty logs, [she] has come to the conclusion that she would like to dismiss her 42 U.S.C. § 1983 claims against Defendant Jones." (Doc. 457, p. 11.) Therefore, Plaintiff's § 1983 claims against LPN Jones are due to be dismissed with prejudice.

nurses would often document that medication was refused when it was, in fact, not available. *Id.*

LPNs Smith and Barnes argue that even if Plaintiff's allegations are true, and the affidavits are an accurate recollection of the facts, the evidence does not show that they acted with the knowledge that doing so would place Battiste at an excessive risk of dying from PCP. (Doc. 498, p. 10.) The Court disagrees. LPNs Smith and Barnes were aware of Battiste's medical condition, and Plaintiff has provided testimony which shows that the failure to provide medicine to an individual who is susceptible to opportunistic infections can be life threatening. Refusing to provide food, baths, and/or medicine to an inmate with knowledge that he needs such care constituted deliberate indifference. *See Hill*, 404 F.3d at 1186; *Ancata*, 769 F.2d at 704. Dr. Simon is entitled to summary judgment because Plaintiff has not shown that she intentionally refused to provide treatment to Battsite. LPNs Smith and Barnes are treated differently because Plaintiff has provided evidence that they intentionally refused to care for Battiste. Their actions have surpassed negligence and constitute deliberate indifference. *See Ancata*, 769 F.2d at 704.

For these reasons, LPNs Smith and Barnes are not entitled to summary judgment as to Plaintiff's § 1983 claims for deliberate indifference against them.

(c)    Naphcare and Dr. Henderson.[27]

Ms. Watkins also alleges that Naphcare, as well as its agents, acted with deliberate indifference to Battiste's serious medical needs through its failure to train and supervise its employees, as well as its failure to fund its medical care program.  (Doc. 401, pp. 18-21.)[28]  Ms. Watkins alleges that the

_____

[27]Dr. Henderson argues in her brief that Plaintiff cannot show that he ever provided medical treatment to Battiste, much less acted in a way which deliberately or recklessly denied any necessary medical care to Battiste.  (Doc. 436, p. 11.)  However, Plaintiff does not appear to assert any claims against Dr. Henderson under § 1983 which do not arise out of his position as a supervisor.  Therefore, to the extent that Plaintiff intends to assert any claims other than those for supervisory liability under § 1983 against Dr. Henderson, summary judgment is due to be granted as to those claims.

[28]In her statement of claims in the Joint Status Report (Doc. 401, p. 21), it is unclear whether Plaintiff's claims against Naphcare for failure to fund are intended to be brought under § 1983 or as separate state law claims.  Plaintiff fails to even mention failure to fund as a claim against Dr. Henderson.  Failure to fund, as a state law claim, is fully addressed in the sections that follow.  Defendants moved for summary judgment as to Plaintiff's claims for failure fund, but she failed to respond to the argument, or to even mention the § 1983 failure to fund argument, in her response brief.  Therefore, the Court treats Ms. Watkins' § 1983 failure to fund claims against Naphcare and Dr. Henderson as abandoned, and they are entitled to summary judgment as to those claims.  *See, e.g.,  Avocent Huntsville Corp.*, 443 F. Supp. 2d at 1329 n. 172; *Bute*, 998 F. Supp. at 1477.

However, even if Plaintiff had not abandoned her claims, Naphcare and Dr. Henderson would still be entitled to summary judgment.  Ms. Watkins would have to show that they had the "deliberate intent" to inadequately fund the care provided at

failure is a "policy or custom" that gives rise to liability under section 1983 because it was the "moving force" behind Battiste's death.  (Doc. 459, p. 22.)  State action is present in a case such as this because a function which is traditionally the exclusive prerogative of the State was performed by Naphcare, a private entity.[29]  *See Jackson v. Metropolitan Edison Co.*, 419 U.S. 345 (1974).   However, a municipality cannot be held liable under section 1983 on a theory of respondeat superior.  *Monell v. New York City Dept. of Social Svcs.*, 436 U.S. 658, 691 (1978).   There must be some evidence that a municipal policy or custom caused the constitutional injury.  *See Leatherman v. Tarrant Co. Narcotics Intelligence and Coordination Unit*, 507 U.S. 163 (1991).  "[R]ecovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality' - that is, acts which

---

the Limestone facility.  *See McDowell v. Brown*, 392 F.3d 1283, 1291 (11th Cir. 2004) (holding that the plaintiff must show that the county had a "deliberate intent" to under staff the jail).  Plaintiff has not provided any evidence to show that either Naphcare or Dr. Henderson was deliberately indifferent to a "strong likelihood, rather than a mere possibility," that injury or death would result from Naphcare or Dr. Henderson's failure to fund.  *Cagle v. Sutherland*, 334 F.3d 980, 987 (11th Cir. 2003).  There is no evidence that any alleged failure to fund deprived Battiste of any necessary medical care.

[29]Plaintiff does not challenge, for the purposes of these motions, that Naphcare should be treated as a "municipality" for purposes of § 1983 supervisory liability.  (Doc. 459, p. 22 n. 1.)

the municipality has officially sanctioned or ordered." *Pembaur v. Cincinnati*, 475 U.S. 469, 480 (1986). Therefore, Naphcare may only be held liable under § 1983 for the execution of an unconstitutional governmental policy or custom. *See Monell*, 436 U.S. at 694. Furthermore, Ms. Watkins must prove that Naphcare "caused the alleged deprivation of rights." *Buckner v. Toro*, 116 F.3d 450, 452-53 (11th Cir. 1997); *see also City of Clanton v. Harris*, 489 U.S. 378, 385 (1989) (reiterating that the first inquiry in any case alleging municipal liability under § 1983 is to ask "whether there is a direct causal link between [the] policy or custom and the alleged constitutional deprivation."); *Ort v. Pinchback*, 786 F.2d 1105, 1107 (11th Cir. 1986) (holding that the plaintiff had not shown that the defendant was directly involved in the injury or that the injury was the result of the defendant's policy or custom). Ms. Watkins must demonstrate that Naphcare, "through its *deliberate* conduct," was the "moving force" behind Battiste's eventual death. *Board of the County of Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 404 (1997) (emphasis in original).

In certain limited circumstances, an allegation of "failure to train" can form the basis of a claim for liability under § 1983 "where a municipality's

failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants." *See Harris*, 489 U.S. at 387, 389.  As noted by the Eleventh Circuit in *Gold v. City of Miami*, 151 F.3d 1346 (11th Cir. 1998), the standard of proof for plaintiffs seeking to impose liability on a municipality for failure to train under § 1983 is high.  *Id*. at 1351 n. 10 ("[P]ermitting cases against cities for their 'failure to train' employees to go forward under § 1983 on a lesser standard of fault would result in de facto respondeat superior liability on municipalities.").  Plaintiff must show not only that Naphcare's employees violated Battiste's rights, but that Naphcare's policies and customs were the "moving force" behind Battiste's injuries and eventual death.  *Id*. at 1350.  A plaintiff cannot establish a deliberate policy of inadequate training of medical providers simply by establishing that they were inadequately trained.  There must have been a "strong likelihood" that the constitutional deprivation would result from the defendant's failure to act.  *See Cagle*, 334 F.3d at 987 (quoting *Tittle v. Jefferson County Com'n*, 10 F.3d 1535, 1540 (11th Cir. 1994)).  Plaintiff must demonstrate not only that Naphcare's employees violated Battiste's constitutional rights, but also that Naphcare's policies

were the "moving force" behind his death.  Likewise, Dr. Henderson cannot

be held liable for the unconstitutional acts of his subordinates at Limestone

on the basis of respondeat superior or vicarious liability.  *See Jenne*, 326

F.3d at 1360.  Dr. Henderson must have either personally participated in the

allegedly unconstitutional conduct or Plaintiff must identify a causal

connection between his actions and the alleged constitutional deprivation.

*Id.*

There is no dispute that Naphcare had an adequate system in place to

train, supervise, evaluate, and terminate employees at Limestone for

failures to obtain, administer, and notify others as to the unavailability of

medication and the documentation of the care either provided or not

provided to Battiste.  (Doc. 459, p. 23.)  However, Plaintiff alleges that

there is a "material question of fact as to whether or not those policies and

procedures were followed, and whether the failure to follow those policies

was the 'moving force' behind Mr. Battiste's death."  *Id.*  Naphcare and Dr.

Henderson offer that it is undisputed that the staff was trained by the

Health Services Administrator (hereinafter referred to as the "HSA") and

that Nurses Smith, Barnes, and Jones were provided orientation by the HSA.

(Doc. 435, p. 14.)   According to Naphcare, Plaintiff has not produced evidence to show that the healthcare unit at Limestone was inadequately staffed.  *Id*.  Naphcare and Dr. Henderson deny that they failed to train, supervise, and monitor the Limestone personnel, as well as that the staff failed to counsel inmates on noncompliance with medication prescriptions. *Id*. at 15.  Finally, they deny that they failed to establish an adequate policy or custom that would have prevented the deprivation of Battiste's constitutional rights and eventual death.  *Id*.

As evidence of "wide spread problems" with Naphcare's care and treatment of prisoners at Limestone, Plaintiff cites to inmate complaints made to defendants Mitchem and Wise, as well as the director of nursing at Naphcare, regarding the unavailability of medications, primarily HIV medications, from 2001 through 2003.  (Doc. 459, pp. 23-24; Pl.'s Exhibit 56.)   Plaintiff also contends that Naphcare was put on notice of the problems at Limestone by the Moore and Associates audit report.  (Pl.'s Exhibit 64.)  She avers that the complaints offered together with the audit report show that, at a minimum, there exists an issue of material fact as to whether Naphcare and Dr. Henderson had prior knowledge of problems at

Limestone with the availability of medication, as well as nurses failing to properly provide and document medication administration.  (Doc. 459, p. 26.)  Plaintiff alleges that neither Naphcare nor Dr. Henderson made any effort to enforce Naphcare's existing policies and procedures with regards to medication administration and ways to correct known problems.  *Id.* at 27.

Ms. Watkins alleges that Naphcare and Dr. Henderson had a custom of "NEVER training, supervising or evaluating its employees with regard to medication availability, administration and appropriate documentation related to administration."  *Id.*  She concludes that "there is a material issue of fact as to whether or not Naphcare and Dr. Henderson's custom and policy of NEVER orienting, training, supervising, evaluating, or terminating its employees caused Mr. Battiste's death."  *Id.* at 28.

Naphcare and Dr. Henderson argue that Plaintiff has failed to prove the "requisite degree of culpability" that Naphcare acted with "deliberate indifference to the consequences of its failure to train and supervise." (Doc. 496, p. 7.)  They refute the credibility of the inmate complaints offered by Plaintiff as support for her contention that there was a "wide

spread problem" regarding the availability of medication at Limestone, and

they contend that the Moore and Associates audit report should be stricken

from the record for the reasons cited in their Motion to Strike.[30]  They also

assert that even if the audit is not stricken it should not be considered

"notice" as to the alleged problems at Limestone because there is no

evidence of when, if ever, the report was provided to Naphcare or Dr.

Henderson.  *Id*. at 14-15.  Finally, Naphcare and Dr. Henderson argue that

even if Plaintiff's assertions regarding their failure to train and supervise are

---

[30]The Naphcare Defendants filed a Motion to Strike (Doc. 504) certain portions of Plaintiff's evidentiary submissions: Plaintiff's experts' reports, Plaintiff's experts' affidavits, the Carpenter Report, the Moore and Associates audit report, the deposition transcript of Ronald Cavanaugh in *Leatherwood v. ADOC*, the affidavit of inmate Eric Howard, the affidavit of inmate Joseph Brown, the affidavit of inmate Keith Lewis, and the affidavit of inmate Lester Reed.  The Naphcare Defendants' motion is due to be denied.

Documents submitted in support of or in opposition to a motion for summary judgment must either be properly authenticated or it must be apparent that they can be reduced to admissible, authenticated form at trial.  *See United States Aviation Underwriters, Inc. v. Yellow Freight System, Inc.*, 296 F. Supp. 2d 1322, 1327 n. 2 (S.D. Ala. 2003).  The Eleventh Circuit has stated that Rule 56(e) of the Federal Rules of Civil Procedure "allow[s] otherwise admissible evidence to be submitted in inadmissible form at the summary judgment stage, though at trial it must be submitted in admissible form."  *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996).  The Naphcare Defendants' objections to Plaintiff's evidentiary submissions based upon the fact that they may contain inadmissible hearsay is irrelevant at this stage.  The statements in question appear to be capable of being reduced to admissible form at trial, if necessary.  Furthermore, Plaintiff has provided evidence that she notified the Naphcare Defendants that she reserved the right to call each of these individuals at trial as witnesses and that it was clear that she intended to rely on both the Carpenter Report and the Moore and Associates audit.

true, she has still failed to offer evidence that their failure was the "moving force" behind Battiste's death.  (Doc. 496, p. 18.)

The Court has noted above that Plainttiff has met her burden of providing evidence that Dr. Simon and LPNs Smith and Barnes have breached the standard of care and that their breaches probably caused Battiste's death.  However, Plaintiff has not provided evidence that any of Naphcare's policies or customs were the "moving force" behind Battiste's death.  Even if the statements made in the Moore and Associates audit are true, and even if Plaintiff's allegations regarding the behavior of LPN's Smith and Barnes are true, it still does not follow that a custom or policy of Naphcare, or Naphcare and Dr. Henderson's alleged failure to train and supervise the employees, was the "moving force" behind Battiste's death.  There does not appear to be any custom, policy, or training regarding LPN's Smith and Barnes' alleged conduct, including refusing to bathe and feed Battiste, as well as failing to notify Dr. Simon of the unavailability of medications.  Plaintiff has simply failed to carry her burden with regard to proving that Naphcare and Dr. Henderson acted in a manner which was deliberately indifferent to Battiste's serious medical needs.

C.     State Law Claims Against Naphcare and Dr. Henderson.

      1.     Failure to Train, Failure to Supervise, and Failure to Fund.[31]

Plaintiff, in her Second Amended Complaint, asserts state law claims against defendants Naphcare and Francis Henderson, M.D., for failure to supervise, failure to train, and failure to fund.  (Doc. 210, p. 10.)  Naphcare and Dr. Henderson argue that they fall within the definition of a "health care provider"[32] under AMLA, which requires this Court to determine whether Plaintiff has, through substantial evidence, established that their alleged failure to supervise, train, and fund the doctors and nurses at Limestone fell below the applicable standard of care and probably caused Battiste's death.  *See* discussion at Section IV.A.2.  (Docs. 435 & 436.)  The

---

[31]As noted above, in her statement of claims in the Joint Status Report (Doc. 401, p. 21.) it is unclear whether Plaintiff's claims against Dr. Henderson and Naphcare for failure to fund are intended to be brought under § 1983 or as separate state law claims. The Court has already stated that because there is no mention of a § 1983 claim for failure to fund in her response brief, the Court treats such a claim as abandoned.

[32]AMLA defines "health care provider" as a "medical practitioner, dental practitioner, medical institution, physician, dentist, hospital, or other health care provider as those terms are defined in Section 6-5-481." Ala. Code § 6-5-542(1). "Other health care provider" includes "[a]ny professional corporation or any person employed by physicians, dentists, or hospitals who are directly involved in the delivery of health care services." Ala. Code § 6-5-481(8).

Court agrees that Dr. Henderson and Naphcare are "health care providers" and that Plaintiff's claims against them are governed by AMLA.

Dr. Henderson never provided medical care to Battiste.  He was the Corporate Medical Director for Naphcare.   Plaintiff's only evidence to support her claim that the Naphcare medical staff was not properly trained and oriented are the twenty-two personnel files she attached to her briefs as evidence and the deposition testimony of Nurses Upland and Lynch, neither of whom are similarly situated experts to Dr. Henderson under AMLA.  By simply presenting Naphcare policies and the employee's personnel files, as well as pointing out that the files do not indicate that the employee nurses received training and orientation, Plaintiff has not shown that Dr. Henderson's alleged negligence in failing to train and supervise probably caused Battiste's death.

Naphcare asserts that it has provided evidence which shows "that its agents met the standard of care" and "that no genuine issue of material fact exists."   (Doc. 435, pp. 6-7.)   However, as discussed in the preceding sections, Plaintiff has met her burden of providing substantial evidence that at least some of Naphcare's employees at Limestone deviated from the

standard of care and that their deviations probably caused Battiste's death. To establish liability against Naphcare, Plaintiff must provide evidence that it failed to adequately fund the medical care program and/or, that it was negligent in its hiring, supervision, and training, and that these alleged acts probably caused Battiste's death.

Plaintiff offers that even though Naphcare had the policies and procedures in place for adequate orientation and training of health care staff, Naphcare and Dr. Henderson failed to follow the procedures.  (Doc. 459, p. 9.)  She contends that of twenty-two personnel files provided by Naphcare of employees who actually worked at Limestone during Battiste's incarceration, twenty were nurses, and only one of the files contains an orientation checklist.    *Id*. at 10.  Plaintiff believes that this creates a material issue of fact as to whether orientation was ever conducted. Plaintiff also offers that "[o]ut of twenty personnel files, there are no terminations, written warnings, verbal warnings, leaves of absence, or evidence of any attempt at corrective action related to the appropriate administration, documentation, and notification of members of the health care team as to the administration and response to prescribed life saving

therapies." *Id*. at 11.   Furthermore, she relies on the testimony and affidavits of Nurses Upland and Lynch to show that shifts at Limestone were inadequately staffed (*e.g.*, RN's were not present when LPN's were providing care), that essential medications were not provided to Battiste, that nurses did not adequately document when medications were unavailable, and that nurses failed to document patient medication refusals. (Doc. 459.)

To show that the negligent acts of Naphcare and Dr. Henderson proximately caused Battiste's death, Plaintiff offers the following statement from Dr. Wohl's expert report:

> The late start of PCP therapy after Mr. Battiste's return to Limestone Prison from the hospital, his subsequent intermittent receipt of even these medications and the complete withdrawal of PCP active drugs after November 18, 2002, each, in my opinion, led to the progressive undertreated PCP which was the cause of Mr. Battiste's death.  These events and the medical record lead me to the opinion that the medical environment at Limestone prison was suffering from an absence of oversight of patient care, poor communication among staff, inadequate documentation and shortage of medication.

(Pl.'s Exhibit 47.)   However, the Court is not persuaded that Dr. Wohl's testimony establishes that the alleged acts/omissions regarding the funding,

training, and supervision of Naphcare's Limestone employees on the part of Naphcare and Dr. Henderson probably caused Battiste's death.  Therefore, even if Plaintiff is correct in her assertions that Dr. Henderson and Naphcare deviated from the applicable standard of care, she has not shown that their deviations probably caused Battiste's death.  Naphcare and Dr. Henderson are entitled to summary judgment as to Plaintiff's state law claims for failure to train, failure to supervise, and failure to fund.

2.    Naphcare's Liability Under Respondeat Superior.

Plaintiff contends that material issues of fact remain as to Naphcare's liability under respondeat superior.  In Alabama:

> The liability of a corporation for the torts of its employees, whether agent or servant, is grounded upon the principle of "respondeat superior," not the principles of agency.  The factual question to be determined is whether or not the act complained of was done, either by agent or servant, while acting within the line and scope of his employment.  The corporation or principal may be liable in tort for the acts of its servants or agents, done within the scope of employment, real or apparent, even though it did not authorize or ratify such acts or even expressly forbade them.

*Autrey v. Blue Cross & Blue Shield of Alabama*, 481 So. 2d 345, 347-48 (Ala. 2007).  Plaintiff argues that Naphcare is liable under respondeat superior for

the negligent acts of defendants Simon, Smith, Jones, and Barnes because they committed underlying acts of negligence while acting within the scope of their employment.  (Doc. 459, p. 20.)  The Court agrees that Naphcare may be held liable through respondeat superior for the acts of its agents, but Plaintiff takes it one step further and alleges that Naphcare is also liable for the negligent acts of unidentified nurses because "it is undisputed that the nurses were Naphcare servants acting in the scope of their employment."  *Id*.  She claims, "Many unidentified nurses failed to fill out the required signature legends on the [MARs] and identify themselves in the medical records."  *Id*. at 21.  She cites to Nurse Upland's testimony that one of the breaches of the standard of care was the failure of the nursing staff to chart their names and identify themselves in the records.  *Id*. (citing Naphcare Def.'s Exhibit G, Upland Depo., pp. 206-47; Exhibits 44 & 45.)

Plaintiff is correct in asserting that Naphcare may be held liable for the negligent acts of its employees/agents.  However, even claims against unidentified nurses are governed by AMLA, and Plaintiff must first establish, through substantial evidence that the unidentified nurses have breached the standard of care and that such breaches probably caused Battiste's death.

Without such a showing, Naphcare may not be held liable for their alleged acts/omissions.

For these reasons, Dr. Henderson and Naphcare are entitled to summary judgment as to Plaintiff's state law claims for failure to supervise, failure to train, and failure to fund.  However, genuine issues of material fact remain as to Plaintiff's claims against Naphcare under respondeat superior for the acts/omissions of Dr. Simon, LPN Barnes, and LPN Smith.

D.    State Law Claims Against Mobile County.

As stated in the section above regarding Mobile County's liability under § 1983, it appears that Plaintiff has abandoned all but her claim alleging that Mobile County breached its contractual duty to provide for the care of City detainees at the Mobile County Metro Jail.[33]  Plaintiff bases her breach of contract claim on the Joint Jail Agreement entered into by Mobile County, the City of Mobile, and the Mobile County Sheriff.  The City and County decided to close their respective jail facilities and construct a single facility to avoid the duplication of manpower and expense.  (Doc. 428, p.

---

[33]Plaintiff also rasied state law claims for violations of Alabama Code §§ 11-14-10, 14-6-19, and 14-6-105.  (Doc. 401, pp. 15-18.)

28.)  As stated above with regards to Plaintiff's § 1983 claims against the County, the operation of the Jail is the responsibility of the Sheriff, while the County is responsible for providing funding.  *See, e.g., Turquitt*, 137 F.3d at 1289.

Plaintiff relies on language in the Joint Jail Agreement for the proposition that the County assumed some duty that is greater than it owed by statute or common law.  (Doc. 428, p. 30 (citing to Joint Status Report, Doc. 401).)  Section E.1. of the Agreement provides: "The County agrees to accept and provide for the secure custody, care and safekeeping of City prisoners in accordance with laws, standards, policies, procedures or court orders applicable to the operations of the joint jail facility."  The County argues that it did not assume the statutory obligation of the Sheriff with regard to the operation of the Jail, who was also a party to the Agreement.  (Doc. 428, p. 31.)  According to the County, the language "merely reflects [its] statutory duty to build a secure facility for prisoners."  *Id*. at 34.  Furthermore, the County offers that the paragraph in question is modified by the phrase "in accordance with the laws, standards, policies, procedures

or court orders applicable to the operations of the joint jail facility."[34] *Id.*

The County avers that reading applicable law into the contract, the language in question simply affirms the differentiated roles of the County and the Sheriff with regard to operation of the Jail. *Id.*

Plaintiff argues "that if the Court finds that even a negligent act occurred at the Mobile County Metro Jail, Mobile County negligently breached the duties it owed under the joint jail agreement." (Doc. 461, p. 17.) She asserts that under well-settled Alabama law, a party may assume or agree to undertake duties that it does not owe under the common law, and if those duties are negligently breached, that party is liable for the reasonably foreseeable consequences of such negligence. However, the

---

[34]In 2002, the Alabama Supreme Court addressed the exact language in question and reversed a lower court's grant of a 12(b)(6) motion to dismiss, finding that they could not determine, as a matter of law, that there was no cause of action at that stage in the case. *Carpenter v. Mobile County*, 841 So. 2d 1237, 1240 (Ala. 2002). The plaintiff in that case was the widow of James Carpenter, the inmate who died at the Mobile County Metro Jail and was discussed in the section above regarding Plaintiff's claims against Sheriff Tillman. The Supreme Court based its reversal on the fact that "nothing in the *pleadings* explains what the 'laws, standards, policies, or procedures or court orders applicable to the operations of the joint jail facility' must be." *Id.* at 1240 (emphasis in original). The Court explained that it "should not be understood as holding that Mobile County may not be able to present evidence in support of a motion for summary judgment . . . to show that, in executing the agreement, it did not assume a duty it did not have to assume." *Id.*

Court is not persuaded that the County undertook any duties towards City prisoners other than providing funding for the Jail.  By law, the County is not responsible for the operation of the Mobile County Metro Jail.  Morever, as discussed in the section above regarding the City's liability under § 1983, even though Battiste was arrested by City police officers, he was indicted on State law charges of attempted murder.

For these reasons, no genuine issue of material fact remains and Mobile County is entitled to summary judgment as to Plaintiff's remaining claim for breach of contract.

V.      Conclusion.

For the foregoing reasons, Defendants' motions for summary judgment are due to be granted in part and denied in part.  A separate order will be entered.

Done this 16th day of August 2007.

_____
L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
124153